IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 18, 2008 Session

## SANDRA KAYE KEMP PARISH, ET AL. v. JERRY DONALD KEMP, ET UX.

**Direct Appeal from the Chancery Court for Carroll County**
**No. 01-CV-0032      Ron E. Harmon, Chancellor**

_____

**No. W2007-02207-COA-R3-CV - Filed December 11, 2008**

_____

This case comes to us as an intra-family dispute over the validity of a nonagenarian's inter vivos gifts and will devises. After this Court held that there was a presumption that Defendants had unduly influenced the decedent, the trial court found upon remand that the Defendants had overcome this presumption and, therefore, upheld the will conveyances and *inter vivos* gifts to the Defendants. Because the evidence does not preponderate against the trial court's finding that Defendants rebutted this presumption of undue influence, we affirm the trial court's determinations.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Kenneth Ray Jones, Jr., Nashville, Tennessee, for the appellants, Sandra Kaye Kemp Parish, Marilyn Coleman Aten, Angela Aten, Gary Harlan Coleman, Sr., Gary H. Coleman, Jr., Vicky Coleman Bird, Jimmie Austin Kemp, Thomas A. Kemp, Michael Kemp, David Argo and Nancy Petty.

Robert T. Keeton, Jr. And Laura A. Keeton, Huntingdon, Tennessee, for the appellees, Jerry Donald Kemp and Annie Jo Kemp.

**OPINION**

*Procedural History*

Plaintiffs/Appellants ("Plaintiffs") filed their Complaint with the trial court on March 2, 2001, contesting Mamie Fesmire's ("Mrs. Fesmire") will and various *inter vivos* gifts that Mrs. Fesmire made to Defendants/Appellees Jerry Donald Kemp and Annie Jo Kemp (together "the Kemps"). After a four day trial, the jury returned a verdict in favor of the Kemps. Plaintiffs appealed the jury verdict to this Court; because of an erroneous instruction submitted to the jury, we remanded this case for a new trial and instructed the trial court that the Kemps and Mrs. Fesmire's relationship created a rebuttable presumption of undue influence. *Parish v. Kemp*, 179 S.W.3d 524,

533–535 (Tenn. Ct. App. 2005).  Upon remand, Plaintiffs waived their right to a jury trial.  The parties stipulated that proof presented at a new trial would be the same as that presented at the previous trial and submitted that the trial court decide the issues based upon the record of the previous trial, briefs from both parties, and oral argument.  The trial court then entered judgment in favor of the Kemps on September 17, 2007, and the Plaintiffs filed a timely notice of appeal to this Court on September 26, 2007.

In its final judgment, the trial court made the following findings:

1) The deceased was at all times in question in control of her mental faculties and very headstrong in both her opinions and her actions.

2) That several witnesses credibly testified that Mrs. Fesmire was alert and there was no credible proof that Mrs. Fesmire was not of sound mind.

3) Mrs. Fesmire met with respected local attorneys who gave her advice independent of third parties, and it appeared she acted upon her own desires and wishes with the advice and consent of said counsel.

4)  Mrs. Fesmire acted independently in the preparation of her will in 1999; that it evidenced her intent and not that of third parties, and that she was well aware of the consequences of her actions.

5) The joint banking account transactions were done by Mrs. Fesmire's own intent without undue influence and with awareness of the consequences of her actions.

6)  The court did not find any action on the part of Mrs. Fesmire that was contrary to her interest or showed undue influence.

### *Standard of Review*

Upon remand, the trial court determined that the Kemps rebutted the presumption of undue influence and entered judgment for the Defendants.  We review the trial court's determination *de novo* and presume the correctness of the trial court's findings unless the evidence preponderates otherwise.  Tenn. R. App. P. 13(d).  We will not reverse the trial court's factual findings unless they are contrary to the preponderance of the evidence.  *Berryhill v. Rhodes*, 21 S.W.3d 188, 190 (Tenn. 2000). We review mixed questions of law and fact *de novo*, with no presumption of correctness. *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005).

In addition, this Court will not reevaluate the trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *In re Estate of Burg*, M2006-00065-COA-R3-CV, 2007 WL 283137, at *11 (Tenn. Ct. App. Jan. 31, 2007) (*no perm. app. filed*).  Because the parties submitted this case to the trial court based largely upon the record from a previous jury trial,

the proof presented to the trial court in this case is documentary evidence. Where the trial court is assessing documentary evidence, this Court will generally draw its own conclusions regarding credibility without deferring to the trial court's judgment. *Bryant v. Baptist Health Sys. Home Care of E. Tennessee*, 213 S.W.3d 743, 750 (Tenn. 2006). In the unique circumstances here, however, the same judge who issued the opinion upon remand conducted the jury trial which is the subject of the appellate record; this Court reversed this case on its first appeal only because of an erroneous jury instruction, and the parties stipulated that the proof on remand was precisely what the trial judge heard during the first trial. Although the trial court reviewed transcripts and depositions upon remand, it heard the witnesses testify during the parties' first trial and has first-hand impressions regarding weight and credibility. Because the trial judge was, therefore, in the best position to evaluate witness credibility, we will not reevaluate his credibility assessments absent clear and convincing evidence. *In re Estate of Burg*, 2007 WL 283137, at *11.

### *Facts*

Mrs. Fesmire and her husband, Howard Fesmire did not have any children, but each had several brothers and sisters and many nieces and nephews. Both Plaintiffs and Defendants are the Fesmires' nieces and nephews. The Fesmires lived together in Atwood tending a pharmacy until May 1996, when Mr. Fesmire passed away. Three weeks later, Mrs. Fesmire fell in her carport and injured her hip. After her injury, Mrs. Fesmire could not stay alone and she moved in with her niece, Marilyn Aten ("Mrs. Aten"), and Mrs. Aten's husband. At that time, Mrs. Fesmire was eighty-nine years old and first learned that she had approximately $900,000.00 in savings accounts. The parties agree that Mrs. Fesmire and Mrs. Aten did not get along particularly well, and within a few weeks Mrs. Fesmire went to live with the Kemps. The parties dispute the underlying cause of Mrs. Fesmire's departure; Mrs. Aten claims that she wanted Mrs. Fesmire to leave because Mrs. Fesmire refused to give money for household expenses and Mrs. Fesmire was hassling Aunt Nell, Mrs. Aten's mother and Mrs. Fesmire's younger sister, who also lived with the Atens. The Kemps claim that Mrs. Fesmire wanted to leave because she felt that Mrs. Aten was overly involved in her finances. Despite any uncertainty regarding the cause of Mrs. Fesmire's departure, the evidence clearly establishes that Mrs. Fesmire went to live with the Kemps in the fall of 1996 until her death in August 2000.

While Mrs. Fesmire lived with the Atens, she assigned a power of attorney jointly to Mrs. Aten and Mrs. Kemp. Almost immediately after she moved in with the Kemps, Mrs. Fesmire visited attorney James Webb ("Mr. Webb") to revoke Mrs. Aten's power of attorney, name Annie Jo Kemp and Jerry Donald Kemp as her new attorneys-in-fact, and change her will. Mr. Webb originally drafted reciprocal wills for Mr. and Mrs. Fesmire in 1988 that conveyed their property first to each other and then to their combined families. Mr. Webb testified that the only changes that Mrs. Fesmire made to her 1988 will in August 1996 was to specifically devise her house in Atwood, Tennessee to the Kemps and to leave Elta Fesmire, Mrs. Fesmire's mentally unstable sister-in-law, her inheritance in trust, with the Kemps as trustees.

-3-

When Mrs. Fesmire met with Mr. Webb in August 1996, the Kemps were present at the beginning of the meeting. Mr. Webb testified that he met with Mrs. Fesmire alone, however, after she expressed an interest in leaving money to the Kemps. Jerry Donald Kemp admits that he joked about Mrs. Fesmire giving them $200,000.00 at that meeting. Mr. Webb explained that at that time Mrs. Fesmire privately told him "Yeah, you know, they're good to me, and they're going to take care of me, and they'll keep me from having to go to a nursing home, and they're going to have to add onto their house" but then indicated that she just was not sure. Mr. Webb, therefore, explained to Mrs. Fesmire and the Kemps that he was not going to draw up documents conveying $200,000.00 to the Kemps. He went ahead that same day, however, and prepared the power of attorney and the codicil leaving Mrs. Fesmire's house to the Kemps.

Bank records indicate that a few weeks later Mrs. Fesmire renewed several one hundred-thousand dollar Certificates of Deposit ("CDs") and made them payable to the Kemps upon her death. It was not until the fall of 1998 that Mrs. Fesmire renewed those CDs with Mr. and Mrs. Kemp as joint account holders. Although the Kemps would often use their power of attorney to renew Mrs. Fesmire's CDs, bank tellers at all but one of the banks where Mrs. Fesmire kept her CDs testified that Mrs. Fesmire was present and personally authorized adding the Kemps as joint account holders.

Around the time Mrs. Fesmire moved in with the Kemps, she began writing checks payable to the Kemps. Mrs. Kemp testified that these checks were general reimbursements for some of Mrs. Fesmire's expenses; for example, the Kemps purchased Mrs. Fesmire two complete wardrobes during the time that she lived with them. Beginning in February 1997, Mrs. Fesmire started paying some of the Kemps' bills in lieu of reimbursing them directly. Mrs. Kemp testified that she suggested that Mrs. Fesmire pay the bills rather than making checks out to her directly because it would be easier for them to keep up with what expenses Mrs. Fesmire was paying. Mrs. Kemp explained that Mrs. Fesmire was the first one to go through the mail and that Mrs. Fesmire decided which expenses and how much toward each bill she wanted to pay.

Mrs. Fesmire met with attorney D.D. Maddox ("Mr. Maddox") in November 1996 to discuss changing her will again, and they met again in January 1997 to sign the drafted will. The Kemps brought Mrs. Fesmire to Mr. Maddox's office but were not present when Mr. Maddox met with Mrs. Fesmire or when Mrs. Fesmire signed the will. At their meeting, Mr. Maddox discussed Mrs. Fesmire's assets, suggested gifting prior to death and the tax ramifications of such gifts, and listened to last minute changes that Mrs. Fesmire wanted to make to her will. Mr. Maddox determined that Mrs. Fesmire understood that the Kemps were going to receive the money in her CDs outside of the will because their names were on the account.

When they met, Mr. Maddox also reviewed Mrs. Fesmire's prior wills and made sure that Mrs. Fesmire knew who her family members were. Mrs. Fesmire's 1988 will made a few minor specific bequests but generally left half of her wealth to her relations and half to Mr. Fesmire's family. Mr. Maddox's daughter, who was present for Mr. Maddox and Mrs. Fesmire's meeting, testified that Mrs. Fesmire's 1997 will did not change the beneficiaries of her estate; it only changed

the amounts that each beneficiary would receive. Unlike Mrs. Fesmire's 1988 will, the 1997 will lists specific monetary bequests to each of the family members that she wanted to inherit from her. Mr. Maddox's daughter testified that Mr. Maddox particularly scrutinized Mrs. Fesmire's intentions because of her elderly age.

In 1999, Mrs. Fesmire met with attorney Walton West ("Mr. West") and changed her will one more time before her death. Although the Kemps brought Mrs. Fesmire to Mr. West's office, Mr. West testified that he discussed the changes that Mrs. Fesmire wanted to make to her will in-depth with her when the Kemps were out of the room. Mr. West also explained to Mrs. Fesmire in great detail about the effect of the Kemps' names being on the CDs. Mr. West further testified that Mrs. Fesmire already knew and understood what he was explaining about the CDs, and when they discovered that Mrs. Fesmire had insufficient funds to cover the joint account conveyances and the specific monetary bequests in the wills, Mrs. Fesmire opted to take $100,000.00 bequests to each of the Kemps out of the will so that there would be sufficient funds in the estate to cover all of the bequests to other family members.

Mrs. Fesmire was in her early nineties at the time she died, and she used a walker the entire time that she lived with the Kemps. The evidence establishes that Mrs. Fesmire was a frugal woman who relied on the Kemps for physical support and transportation. By all accounts, however, Mrs. Fesmire maintained a strong relationship with the Kemps both before and during the time that they cared for her, and she remained a strong-willed woman until her death on August 17, 2000.

### *Analysis*

On plaintiffs' previous appeal, this Court held that there was a confidential relationship between the Kemps and Mrs. Fesmire. *Parish v. Kemp*, 179 S.W.3d 524, 531 (Tenn. Ct. App. 2005). This Court articulated that the presence of a confidential relationship shifted the burden of proof to the Kemps to demonstrate that Mrs. Fesmire's financial transactions were fair by clear and convincing evidence. *Id.* This Court quoted that it was "mindful that 'the presumption of undue influence extends to all dealings between persons in fiduciary and confidential relations, and embraces gifts, contracts, sales, releases, mortgages and other transactions by which the dominant party obtains a benefit from the other party.'" *Id.* (quoting Gordon v. Thornton, 584 S.W.2d 655, 658 (Tenn. Ct. App. 1979)). At trial, the burden was, therefore, on the Kemps to demonstrate the fairness of both the testate conveyances and the *inter vivos* gifts to them.

Plaintiffs' main argument is two-fold. First Plaintiffs assert that the Kemps can only prove the fairness of the transaction with evidence of independent advice. Second, Plaintiffs argue that the Kemps offered insufficient proof to establish the fairness of the transaction. A presumption of undue influence can generally be overcome by clear and convincing evidence that the transaction was fair and not procured through undue influence. *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995). The Tennessee Supreme Court has explained, however, that in some circumstances where it would otherwise be difficult to show the fairness of the transaction a plaintiff can only rebut the presumption with evidence of independent advice. *Richmond v. Christian*, 555 S.W.2d 105, 108–09

(Tenn. 1977). Our first inquiry, therefore, is whether the only way for the Kemps to rebut the presumption of undue influence was to prove that Mrs. Fesmire had received independent advice.

In *Richmond v. Christian*, the Tennessee Supreme Court articulated that independent advice is necessary to overcome the presumption of undue influence where circumstances are such that it would be difficult to show the fairness of the transaction without proof of independent advice. *Id.* at 108. Such circumstances particularly arise where a feeble donor impoverishes herself by the gift or the conveyance seems unnatural given the circumstances. *Id.* This Court, in *Fell v. Rambo*, held that evidence of independent advice was not required to rebut the presumption of undue influence so long as the donor did not impoverish herself. *Fell v. Rambo*, 36 S.W.3d 837 (Tenn. Ct. App. 2001). Although Mrs. Fesmire gave the Kemps joint ownership of hundreds of thousands of dollars in CDs, Mrs. Fesmire was not impoverished by the transaction; she still had other accounts and assets that remained solely in her name, and unlike the donors in *Richmond* and *Fell* who completely gave away their property, Mrs. Fesmire still had access and ownership rights over the money that remained in the joint CD accounts. We find, therefore, that the circumstances in this case do not require the Kemps to overcome the presumption of undue influence solely with proof that there was independent advice.

Our second inquiry is whether the trial court properly found that there was clear and convincing evidence sufficient to overcome the presumption of undue influence as to Mrs. Fesmire's 1997 will, her 1999 will, and her *inter vivos* transfers. A party trying to rebut the presumption must establish by clear and convincing evidence that the transaction was fair and not procured through undue influence. *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995).

> Courts should exercise the utmost care and caution before concluding that the solemn act of a decedent, such as execution of a deed or will, should be invalidated; but it is equally important that they be vigilant to prevent imposition upon those who are weak, frail, and vulnerable to the influence and importunities of others who exercise a dominant position over them.

*Richmond v. Christian*, 555 S.W.2d 105, 109 (Tenn. 1977). Generally the strength of rebutting the presumption varies with the circumstances of each case and the strength of the presumption of undue influence. *Id.* at 108. This Court recognizes that suspicious circumstances of undue influence often include: (1) the existence of a confidential relationship between the testator and the beneficiary; (2) the testator's physical or mental deterioration; (3) the beneficiary's active involvement in procuring the will, (4) secrecy concerning the will's existence; (5) the testator's advanced age; (6) the lack of independent advice in preparing the will; (7) the testator's illiteracy or blindness; (8) the unjust or unnatural nature of the will's terms; (9) the testator being in an emotionally distraught state; (10) discrepancies between the will and the testator's expressed intentions; and (11) fraud or duress directed toward the testator. *Kelley v. Johns*, 96 S.W.3d 189, 196 (Tenn. Ct. App. 2002). Where, however, an automatic presumption of undue influence exists due to a confidential relationship, this Court has often considered a lack of suspicious circumstances as evidence to rebut an automatic legal presumption of undue influence. *See, e.g., Simmons v. Foster*, 622 S.W.2d 838, 841 (Tenn Ct. App.

1981) (the evidence that decedent was capable and strong-willed overcame presumption of undue influence). This Court has recognized that courts should refrain from prescribing the requisite type or number of suspicious circumstances that may invalidate a will; the issue should be decided, rather, on "'the application of sound principles and good sense to the facts of each case.'" *Kelley* 96 S.W.3d at 195 (quoting *Childress v. Currie*, 74 S.W.3d 324, 329 (Tenn. 2002)).

The presumption of undue influence, in this case, arises from Mr. and Mrs. Kemp's position as Mrs. Fesmire's attorneys-in-fact. After reviewing the voluminous record, we find, however, that the Kemps have successfully rebutted that presumption of undue influence. Despite the testator's advanced age, the Kemps have presented strong evidence that Mrs. Fesmire had a headstrong personality, she received independent advice explaining the effects of her conveyances, and the will terms and gifts seem just and natural. We find, therefore, considering the circumstances as a whole, that the trial court properly found that the Kemps rebutted the presumption of undue influence.

### A. Testator's Mental State

The trial court found as a matter of fact that Mrs. Fesmire was "headstrong in both her opinions and her actions," and the record on appeal strongly supports this finding. Witnesses that knew the Fesmires explained that Mr. Fesmire had spoiled Mrs. Fesmire during their marriage, that Mrs. Fesmire was temperamental when she did not get what she wanted, and that you could not make her do anything unless it was her own idea. Mrs. Fesmire's pastor in Atwood, Stephen Mark Earheart ("Mr. Earheart"), testified that he saw Mrs. Fesmire often after she moved to Nashville because Mr. Kemp would bring Mrs. Fesmire back to visit a couple of times a month; Mr. Earheart stated that Mrs. Fesmire had very strong opinions, that he thought Mrs. Fesmire would have felt comfortable telling him almost anything, and that Mrs. Fesmire never gave him any impression that the Kemps were forcing her to do something that she did not want to do. Mrs. Kaye Greenway ("Mrs. Greenway"), who knew Mrs. Fesmire for over 40 years testified that Mrs. Fesmire was "strong-willed" and that it was hard to change her mind. A friend and fellow church-goer, Wanda Murray ("Mrs. Murray"), testified that she had also known Mrs. Fesmire for over 40 years, that Mrs. Fesmire did not let anyone change her mind, and that she did not notice any change in Mrs. Fesmire's personality after she moved to Nashville. Another of Mrs. Fesmire's friends, Mary Churchwell ("Mrs. Churchwell"), testified that Mrs. Fesmire "was a nice person as long as she got her way. She was going to have her way one way or another."

Even the Plaintiffs admitted that Mrs. Fesmire had a very strong-willed personality. Mrs. Aten testified that Mrs. Fesmire was stubborn. Gary Coleman, Mrs. Aten's brother and one of the plaintiffs, testified that he agreed with Mrs. Kemp's statement that "you can't make [Mrs. Fesmire] do anything, but you can talk her into it" because Mrs. Fesmire was so strong-willed that you could not tell her what to do.

### B. Natural Gift

The Tennessee Supreme Court has stated that

-7-

it is not influence that invalidates a conveyance or will but undue influence; that "(a) person has a right by fair argument or persuasion to induce another to make a will (sign a deed), and even to make it in his own favor," provided the influence is "exerted in a fair and reasonable manner, and without fraud or deception."

*Kelley v. Allen*, 558 S.W.2d 845, 847 (Tenn. 1977) (quoting Phillips' Pritchard on Wills, §§ 130–31). The trial court found that "Mrs. Fesmire's actions did not fall outside what might be expected of any other person in her circumstances . . . [and] the disposition of her assets were reasonable for a person of her status and situation."

The testimony established that Mrs. Fesmire had been exceptionally fond of Mr. Kemp from a very early age. Mrs. Greenway, Mrs. Murray, and Mrs. Churchwell, who have each known Mrs. Fesmire for over 40 years, all testified that Mrs. Fesmire had spoken often about Mr. Kemp throughout the years but had never mentioned any other nephews or nieces. Billy Kemp, Mr. Kemp's and the plaintiff Sandra Parish's brother, testified that Jerry had often helped their mother and Mrs. Fesmire visit. After she moved to Nashville, Mrs. Fesmire seemed very happy and told Mrs. Greenway that she "couldn't have had children of my own that have been any nicer to me and any better to me than [the Kemps.]" Stephen Mark Earheart, Mrs. Fesmire's pastor in Atwood, testified that Mrs. Fesmire often shared strong opinions but never said anything bad about the Kemps.

On the other hand, the Plaintiffs who testified admitted that they did not have a very close relationship with Mrs. Fesmire at the time of her death. Jimmie Kemp testified that he only sent Mrs. Fesmire flowers 2-3 times and called the Kemp residence while Mrs. Fesmire lived there maybe 9 times over the course of four years. Nancy Petty, Jimmie Kemp's sister, testified that she did not see Mrs. Fesmire much after she was grown, and only talked to her on the phone until Mrs. Fesmire could not hear her.[1] Both Mr. and Mrs. Aten testified that they were frustrated with Mrs. Fesmire when they lived with her and, therefore, they had limited contact with her after she moved out.

Like the trial court, we find that the terms of Mrs. Fesmire's will seem natural. Although the Kemps drove Mrs. Fesmire to both Mr. Maddox and Mr. West's offices, they did so upon Mrs. Fesmire's request that she wanted to change her will. The evidence establishes that the Kemps loved and cared for Mrs. Fesmire during the last four years of her life and Mrs. Fesmire cared for and appreciated the Kemps. The evidence also establishes that Mrs. Fesmire valued family but expressed concern even before her husband died about family members that she never saw inheriting all of her money. Mrs. Churchwell testified that she advised Mrs. Fesmire that she could change her will if she did not want all of her family members to inherit from her. The bequests in Mrs. Fesmire's will reflect this intent; Mrs. Fesmire gave the majority of her money to her nephew that she was most fond of and who had cared the most for her during her lifetime, but, nevertheless, gave smaller

---

[1]There are no other allegations in the record that Mrs. Fesmire had any hearing problems.

bequests to other relatives that she occasionally saw.[2] We , therefore, consider Mrs. Fesmire's will conveyances together with the *inter vivos* gifts to be natural gifts.

### C. Independent Advice

The trial court found that Mrs. Fesmire met with respected local attorneys and received independent advice from them. Plaintiffs argue, however, that the Kemps failed to prove that Mrs. Fesmire received independent advice regarding the "advisability" of Mrs. Fesmire's testamentary dispositions and *inter vivos* gifts. We disagree and find that there was some evidence of independent advice.

Plaintiffs rely on the Supreme Court's language in *Richmond v. Christian* that an independent party must give advice "respecting the consequences and advisability of the gift." *Richmond v. Christian*, 555 S.W.2d 105, 107 (Tenn. 1977). In *Richmond*, the Tennessee Supreme Court required decedent's son to overcome a presumption of undue influence solely with evidence of independent advice. The court found that the son failed to met this burden where the son was seated across from his mother during her conversation with an attorney, where the son, not the mother, was the attorney's client, and where the attorney admitted that his discussion with the mother was cursory and he only explained that the deed transferred the entire tract to her son and determined that was the mother's intent. *Id.* at 109.

Plaintiff contends that Mrs. Fesmire did not receive independent advice in this case because neither Mr. West nor Mr. Maddox advised Mrs. Fesmire on what bequests she should make. We do not, as plaintiff contends, interpret that *Richmond* requires attorneys be in the business of telling testators what monetary amounts they should leave to their loved ones in order for their advice to be considered independent. In its analysis, the Court in *Richmond* applied the following definition of independent advice:

> [p]roper independent advice in this connection means that the donor had the preliminary benefit of conferring fully and privately upon the subject of his intended gift with a person who was not only competent to inform him correctly as to its legal effect but who was furthermore so disassociated from the interests of the donee *as*

---

[2] After Mr. West drafted Mrs. Fesmire's 1999 will, the Kemps, Mr. Maddox, and Mrs. Fesmire realized that the draft actually conveyed more money than Mrs. Fesmire had left in accounts that remained solely in her name. In order to fulfill the specific bequests that she had made to each of her other family members, Mrs. Fesmire actually deleted $100,000.00 bequests that she had made to each of the Kemps in her 1997 will and the 1999 draft so that the other beneficiaries would receive the amounts she wanted given in her 1999 will.

The specific 1999 will bequests include: $15,000.00 to Buman Argo; $7,500.00 to John Williams, Jr.; $7,500.00 to Dick Williams; $15,000.00 to Billy Kemp; $15,000.00 to Sandra Parish; $20,000.00 to Jimmy Kemp (referred to at trial as Jimmie Kemp); $20,000.00 to Nancy Kemp Petty; $5,000 to Elta Fesmire; $15,000.00 to David McCollum; $7,500.00 to Jeff McCollum; $7,500.00 to Linda McCollum; $3,500.00 to Phillip McCollum; $15,000.00 to Gary Coleman; $15,000.00 to Marilyn Aten; $15,000.00 to John Fesmire; $15,000 to Sharon Fesmire Cotton; $3,500.00 to Gloria McCollum; $3,500.00 to Danny McCollum; $3,000.00 to Atwood First Methodist Church; and $3,000.00 to Pisgah Cemetery of Atwood.

> *to be in a position to advise the donor impartially and confidently as to the consequences to himself of his proposed benefactions.*

*Id.* at 109 (quoting *Turner v. Leathers*, 232 S.W.2d 269, 271 (1950)). Applying this interpretation, we find that the trial court properly held that Mrs. Fesmire received independent advice for the joint CD accounts and testamentary conveyances.

Mrs. Fesmire received independent advice with her 1999 will. Her attorney, Mr. West testified that he met with Mrs. Fesmire privately. Mr. West discussed the changes from Mrs. Fesmire's 1997 will in detail. Although Mr. West testified that he had previously drafted each of the Kemp's wills, Mr. Kemp testified that he suggested that Mr. West draft the 1999 will because Mrs. Fesmire's previous attorney, Mr. Maddox, had retired and Mr. Kemp was familiar with Mr. West because he had worked in court as a trooper when Mr. West had been a general sessions judge. Mr. Kemp also testified, however, that he had not seen Mr. West in fifteen to twenty years before Mr. West drafted the wills. Mr. West also testified that he and his wife went to the Kemp's home so that Mrs. Fesmire could sign the will, and Mr. West went over the details of the will with Mrs. Fesmire in-depth once more. In addition, neither of the Kemps was present at the time that Mr. West explained the contents of the will to Mrs. Fesmire or when Mrs. Fesmire signed the will.

Mrs. Fesmire also received independent advice regarding the CDs that she conveyed to the Kemps. The evidence indicates that Mrs. Fesmire received independent advice from two separate sources. Bank tellers testified that they explained to Mrs. Fesmire that adding the Kemps as joint account holders gave them unfettered access to those accounts and Mrs. Fesmire understood what she was doing when she added the Kemps as joint owners. Additionally, the evidence indicates that Mrs. Fesmire spoke with her attorney, Mr. Maddox in November 1996 about gifting prior to death and the tax consequences of that type of estate planning. Although Mrs. Fesmire set up most of the CDs in the fall of 1996 "payable upon death" to the Kemps, Mrs. Fesmire did not make the Kemps joint account holders until the fall of 1998, after she had spoken to Mr. Maddox. In light of these circumstances, we agree with the trial court that there is evidence of independent advice.

### *Conclusion*

Considering the totality of the circumstances in the record as a whole, we find that the evidence does not preponderate against the trial court's finding that the Kemps overcame the presumption of undue influence. The Kemps presented evidence of Mrs. Fesmire's strong-willed personality, the natural nature of Mrs. Fesmire's gift, and Mrs. Fesmire's receipt of independent advice. Together, the trial court found that all of the transactions between the Kemps and Mrs. Fesmire were fair and not procured through undue influence. We do not disagree. The judgment of the trial court is affirmed. Costs of this appeal are, therefore, taxed to the Appellants,

Sandra Kaye Kemp Parish, Marilyn Coleman Aten, Angela Aten, Gary Harlan Coleman, Sr., Gary H. Coleman, Jr., Vicky Coleman Bird, Jimmie Austin Kemp, Thomas A. Kemp, Michael Kemp, David Argo, and Nancy Petty, and their surety, for which execution may issue if necessary.

_____

DAVID R. FARMER, JUDGE