IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 11, 2009 Session

# EMILY CHRISTINE WIMLEY v. EMILY ANNETTE WIMLEY AND JERRY LEE WIMLEY AND THE FIRST NATIONAL BANK OF MANCHESTER, TENNESSEE

Appeal from the Circuit Court for Coffee County
No. 35995     L. Craig Johnson, Judge

No. M2008-01358-COA-R3-CV - Filed August 21, 2009

This case involves the validity of transfers of property and money from a mother to her daughter and son-in-law. The trial court determined that there was a confidential relationship between the mother and her daughter and that the defendants failed to overcome the presumption of undue influence. We affirm the trial court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P.J., M.S., and RICHARD H. DINKINS, J., joined.

James H. Threet, III, Manchester, Tennessee, for the appellants, Emily Annette Wimley and Jerry Lee Wimley.

John Stanley Rogers and Christina Duncan, Manchester, Tennessee, for the appellee, Emily Christine Wimley.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

Emily Christine Wimley ("Christine") is the mother of Emily Annette Wimley ("Emily").[1] Emily is married to Jerry Lee Wimley ("Jerry").[2] Christine had bariatric surgery in March 2002; after the surgery, she experienced extensive complications that required her to be hospitalized for about nine months. Christine filed a medical malpractice lawsuit in February 2003.

---

[1] To avoid confusion, we will refer to the parties by their first names.

[2] Although he shares the same last name as Christine and Emily, Jerry is not a blood relative.

Christine began outpatient psychiatric treatment in April 2004 following a hospitalization for a major depressive disorder with psychotic features. In September 2004, Christine's outpatient clinician gave a diagnosis of bipolar disorder, most recent episode mixed, severe with psychotic features. In January 2005, Christine was hospitalized with suicidality.

Christine moved in with Emily and Jerry in January 2005 and lived with them in their home until July 2007. During the time when Christine lived with them, Emily and Jerry received regular income only from her job at WalMart and his job at Batesville Casket Company.

Christine settled her medical malpractice lawsuit for a large sum of money in February 2005. Christine's attorney, Stanley Rogers, disbursed part of the settlement proceeds to her on March 21, 2005. Emily accompanied her mother to Mr. Rogers's office, where Christine received a check in the amount of $69,685.63. Christine and Emily then proceeded to People's Bank and Trust Company to negotiate the check. Christine received cash in the amount of $9,685.63 and a cashier's check in the amount of $60,000.00. Christine deposited the $60,000.00 in her account at the First National Bank in McMinnville.

On March 25, 2005, Emily took Christine to the office of attorney Mark Williams. Christine executed a quit claim deed conveying her house and property on Sherwood Drive in McMinnville to Emily with reservation of a life estate. The deed was witnessed by a notary public.

On April 1, 2005, Christine returned to attorney Rogers's office. That day, she signed a general durable power of attorney, a will, a living will, and a durable power of attorney for health care. The general durable power of attorney named Emily as Christine's attorney in fact, as did the health care power of attorney. Under the terms of the will, Christine left her property equally to her three children: Emily and her two brothers, William Russell Smartt and Gregory Ross Smartt.

A portion of the malpractice settlement proceeds was structured as an annuity, which would pay Christine $1,162.66 a month for life, guaranteed for 20 years. The annuity payments began in April 2005. Christine also received Social Security payments of $545.01 per month and retirement benefits of $109.25 per month. Thus, Christine received direct deposits totalling $1,816.93 a month into her account at First National Bank of McMinnville.

On October 3, 2005, Christine was hospitalized for psychiatric treatment; she was diagnosed with major depressive disorder, recurrent; history of sedative abuse; and history of prescription narcotic abuse. On October 13, 2005, attorney Rogers made another settlement disbursement to Christine, this time in the amount of $58,262.59. Emily again accompanied Christine to Mr. Rogers's office. The entire check was deposited into Christine's account at First National Bank of McMinnville. While hospitalized in November 2005 for complaints of epigastric pain, Christine was noted to be experiencing major problems with depression. On November 30, 2005, Christine was seen in the emergency room with depression and was given additional medication.

On December 6, 2005, Christine went in the First National Bank of McMinnville and withdrew $96,486.68 from her account in the form of a cashier's check. The money was deposited into Emily and Jerry's joint savings account at the First National Bank in Manchester. On December 16, 2005, Christine transferred the title to her car, a 2005 Chrysler, to Emily.

In August 2006, Emily conveyed the Sherwood Drive property she had received from Christine in March 2005 to Dorothy Herrin, and Christine signed the warranty deed to convey her life estate interest. Emily deposited the entire proceeds from the sale, $80,370.84, into a joint account with her husband at the Ascend Federal Credit Union. On July 12, 2007,[3] Emily and Jerry deposited $59,179.56 in cash and $81,954.69 in the form of a cashier's check from Ascend into their account at First National Bank of Manchester; that same day, they paid off the mortgage on their home in the amount of $22,775.13.

During the period from 2005 through July 2007, Emily and Jerry made the following purchases:

- Purchase of a 2004 Dodge Ram pickup truck for approximately $27,000 to $28,000

- Purchase of a Suntracker pontoon boat for $23,067.05

- Purchase of a lawn mower with a check for $8,274.36

- Purchase of 2007 Honda motorcycle and then payment in full of debt with check for $28,499.79

- Purchase of a used 1995 Fleetwood camper for $4,382.25 with title and fees

In May 2007, Christine was hospitalized for depression; a psychiatric evaluation also noted polysubstance abuse. Christine was hospitalized in June 2007 with physical and mental problems. A psychiatric evaluation yielded a diagnosis of bipolar disorder, with notations that Christine had a history of schizophrenia and that dementia should be ruled out. Christine was hospitalized again in late June and July 2007. A neuropsychological evaluation includes the following recommendation: "Mrs. Wimley's impulsivity and relative difficulty on tasks that require higher order reasoning may make independent decision making difficult for her. It will be helpful to have a trusted advisor such as a close relative provide structure, support, and assistance in such matters." When she was released from the hospital on July 12, 2007, Christine did not return to live with Emily and Jerry.

On July 18, 2007, Christine filed this lawsuit against Emily, Jerry, and the First National Bank in Manchester. She also revoked the durable power of attorney she had given to Emily. In her

---

[3]Christine was in the hospital for psychiatric treatment on July 12, 2007.

complaint, Christine alleged the Emily and Jerry had perpetrated "fraud, embezzlement and misappropriation of funds." She requested and obtained a temporary restraining order to prevent Emily and Jerry from accessing or withdrawing funds from their accounts or "removing, selling, mortgaging, encumbering or in any manner dissipating any real or personal properties" owned by or titled to them. The bank was ordered to freeze all accounts owned individually or jointly by Emily or Jerry.

In January 2008, the court granted the plaintiff's motion to amend the complaint to add a paragraph to include the transactions in March 2005 and August 2006 by which the Sherwood Drive property was conveyed to Emily with reservation of a life estate for Christine and then sold to a third party.

THE HEARING

This case was heard over two days in May and June 2008. At the beginning of the trial, counsel for the defendants noted that the complaint did not raise the issue of competence.

Emily Wimley testified that Christine wanted Emily to have the Sherwood Drive house and told Emily to get an attorney to draw up the papers; Emily chose to go to Mark Williams. Emily also testified that her mother wanted her to sell the Sherwood Drive house, including Christine's life estate interest, to Dorothy Herrin. According to Emily, Christine gave her all the proceeds from the sale of the house.

Emily testified that, after the power of attorney was executed in April 2005, she used the power of attorney on occasion to take care of her mother's financial affairs. Emily later testified that, even before Christine executed the durable power of attorney, Emily signed Christine's name on checks in order to pay her bills when she was sick. Emily did not, however, use the power of attorney to make any of the conveyances or transfers of money at issue in this case. According to Emily, Christine voluntarily signed her own name to all of the required documents.

Emily stated that Christine gave Emily her car, a 2005 Chrysler, as well as $96,000 and the money to pay off Emily's and Jerry's mortgage. Emily admitted that, when Christine was released from the hospital in July 2007, she was essentially destitute, with no house, no car, and no available cash until the next direct deposits in August 2007. Emily stated that it was Christine's choice to give all of her possessions to Emily and that all of the conveyances and gifts in question were her mother's idea. She also said that Christine wanted her to quit her job at Wal-Mart.

Asked about her mother's mental problems, Emily stated that her mother was bipolar but that no one had ever said she was incompetent to conduct her own affairs. The defendants introduced into evidence four audio tapes and transcripts of telephone conversations between Emily and Christine concerning some of the transactions at issue.

The plaintiff introduced a collective exhibit of medical records to which the parties had previously stipulated, including records concerning Christine's outpatient and inpatient psychiatric treatment, as well as a summary of the medical records. The defendants did not object to the introduction of the stipulated records or the summary. At the plaintiff's request, the court further admitted the deposition for proof of Dr. Albert Brandon, Christine's family care physician since November 2005, who opined that "she did not have the capacity to make those decisions that were in her best interest" during the time she was treated at his clinic.

Christine Wimley testified that, while she was living with Emily and Jerry, Emily paid all of the household bills out of Christine's bank account at First National Bank of McMinnville. When asked whether she intended to make herself destitute by giving everything to Emily, Christine testified:

> No, sir. I don't recall signing the car to her. I don't recall signing the house to her. I gave her a necklace and a ring, and the rest of the jewelry was supposed to be mine. I did not give her the monies for their benefit. I asked her to take care of the money on my–for my behalf, on my behalf. I told her to buy the groceries and to pay what bills that she had paid. And I gave her the $22,000 to pay off her pickup truck, and that was all that I gave her.

According to Christine, Emily and Jerry lied to her: "They paid cash for all those items they bought, and they told me–she told me they was making payments on them. And they had taken my money–took my money and paid for them."

The defense introduced the deposition of Dr. David Florence for proof. Dr. Florence testified about his experience assessing inmates with mental health problems and as a consultant for a drug rehab and mental health service company. He reviewed the records concerning Christine Wimley and opined that she "had the capacity to conduct her own affairs."

Jerry Wimley, Emily's husband and Christine's son-in-law, testified that Christine told him that she wanted Emily to have Christine's property, quit her job, and take care of Christine. He stated that Christine told him multiple times that she wanted to sell the house on Sherwood Drive. Jerry stated that he and Emily used some of the money she got from her mother to pay off the pontoon boat, to buy a motorcycle and lawnmower, and to pay off the mortgage on their house.

The defense called various witnesses to testify about their involvement in the transactions at issue. Elizabeth McKenzie, county clerk, testified about the documents maintained by her office evidencing Christine Wimley's transfer of the 2005 Chrysler to Emily Wimley as a gift. Ms. McKenzie did not witness Christine signing the title. Edward North, an attorney who was working as a clerk at Mr. Rogers's office at the time of the execution of Christine's will, durable power of attorney, and other documents, testified that he acted as a witness to the execution of the documents and did not have any basis for questioning Christine's capacity to execute them. Susan Prince, a title company employee and notary public who participated in the closing on the sale of the Sherwood

Drive house, likewise did not have any reason to question Christine's ability to understand what she was doing. Belinda Phillips, an employee at the First National Bank in Manchester, deposited the check for $96,486.68 drawn on the First National Bank in McMinnville into Emily and Jerry's account. The check was endorsed by Christine and Emily. Ms. Phillips did not see Christine on the day of the deposit. Melody Hawkins, an employee of First National Bank in McMinnville, testified that she handled the December 6, 2005 transaction in which Christine closed out her savings account, withdrawing some $96,000. Ms. Hawkins saw Christine sign the necessary document and thought she appeared to know what she was doing. When Ms. Hawkins questioned Christine as to whether the bank had done anything to upset her, Christine replied that the bank had always been nice to her but she just wanted to close out the account. Sherry Burdette, a former employee at Mr. Rogers's law firm and a notary public, acted as a witness to Christine's signing of documents on April 1, 2005. She believed Christine was of sound mind and aware of what she was doing that day.

Dawn Wimley, Emily's daughter and Christine's granddaughter, also testified. Dawn stated that Christine had told her that she wanted Emily to have the disputed property "because of everything [Emily] was doing for her." Christine also told Dawn that she wanted Emily to have the proceeds from the sale of the Sherwood Drive property. Dawn testified that Christine did not want Emily to work; Christine wanted Emily to stay home with her. Dawn believed that her grandmother was coherent and lucid and knew what she was doing. Christine told Dawn a number of times that she gave everything to Emily. She gave Emily her car because Emily took her everywhere and Christine did not want to drive.

At the end of the first day of the trial, the court had a discussion with the lawyers concerning caselaw on the applicable burden of proof. Plaintiff's counsel offered the court a case dealing with undue influence and confidential relationships. Defense counsel asked whether the court wanted the parties to submit briefs regarding confidential relationships. The court stated: "We've got a situation here where you've got a confidential relationship which creates a presumption of undue influence which shifts the burden to you, Mr. Threet [defense counsel]."

On the second day of trial, the defense called Susan Wilson, an employee with Mr. Williams's law firm and a notary public, who witnessed Christine's signature on the deed transferring her house to Emily. She did not recall anything suspicious or questionable about Christine's conduct or demeanor.

Lisa Foster, an employee at Mr. Rogers's law firm and notary public, testified that she notarized Christine's signature on the will, durable power of attorney, and living will. Christine appeared to be coherent and seemed to understand what was going on. Ms. Foster also notarized Christine's signature on the complaint in this case. Ms. Foster stated that she had no reason to doubt that Christine knew what she was signing. Ms. Foster was also present when Mr. Rogers made the two large settlement disbursements to Christine; she stated that Christine appeared lucid. During the course of the malpractice litigation and the present litigation, Ms. Foster had fairly frequent contact with Christine, who participated in preparing for depositions and interrogatory answers and appeared lucid.

The defense also called attorney Stanley Rogers to testify about his relationship with Christine as her attorney over the years. Mr. Rogers testified that his interaction with Christine had never caused him to question her competence.

William Smartt, Christine's first husband, testified that he had a conversation with Christine after she received her settlement. He wanted to borrow money from her. According to Mr. Smartt, Christine told him that she had given everything to Emily.

The defense recalled Emily as a witness at the end of the trial. She testified that, sometime prior to Christine deeding the house to her, she heard her mother tell her brother, Ross Smartt, that she would give the Sherwood Drive house to him and his wife if she could move in with them and they would take care of her.

At the end of the proof, the plaintiff moved to amend the complaint to conform to the evidence by adding a paragraph asserting that Emily and Jerry "exerted undue influence" over Christine and that Christine "lacked the capacity to make the transactions referred to above." After hearing arguments from both sides, the court granted the plaintiff's motion.

TRIAL COURT'S DECISION

In its order entered on June 30, 2008, the court incorporated the following findings from its ruling from the bench:

> The Court finds by proof in the case that a confidential and fiduciary relationship existed between at least one of the defendants, that being Emily Wimley–she was the dominant party in the relationship–over Christine Wimley, the plaintiff, which creates a presumption of undue influence in this case. . . . This is really about whether or not this gift was a result of undue influence or whether it was the free, uncoerced will of the plaintiff making that decision.

> The Court . . . believes that Ms. Christine Wimley, due to her frailty and age and mental I'm going to say problems–manic depressive, bipolar, severe depressions–was infirmed [sic] and had lesser capacity to make decisions based entirely on her free will at the time of these transactions in question.

> I find that the defendant has not overcome that presumption by showing clear and convincing evidence of the fairness or otherwise that these gifts were given by . . . Ms. Christine Wimley's free, uncoerced will except for I find that based on the testimony of Ms. Christine Wimley that as to some things [the defendants] have overcome that presumption. There is a necklace and a ring. . . . I also find that you've overcome the presumption in regards to the $22,000 to pay the pickup truck.

-7-

The court also found that Christine intended to give Emily "enough money to pay the monthly bills," which the court determined to be $1,000 per month.

Based upon these findings, the trial court entered judgment in the amount of $209,193.10 against Emily and Jerry Wimley.[4]  The First National Bank of Manchester was ordered to pay funds on deposit in the amount of $18,399.35 to the court clerk to be used to help satisfy the judgment. The court further ordered attached and seized the Honda motorcycle, the Fleetwood camper, the pontoon boat, and the lawn mower; the court clerk was to sell these items and pay the proceeds to Christine Wimley.  Furthermore, Emily was ordered to deliver and transfer title to the 2005 Chrysler to Christine; the fair market value of the car, $15,387.50, was to be credited against the judgment. The court denied the defendants' motion for a new trial.

ISSUES ON APPEAL

Emily and Jerry Wimley argue on appeal that the trial court erred in allowing the plaintiff to amend the complaint to conform to the proof.  They further assert that the trial court erred in finding a confidential relationship, in finding undue influence, and in finding that the defendants did not overcome the presumption of undue influence by clear and convincing evidence.

STANDARD OF REVIEW

We review a trial court's findings of fact with a presumption of correctness and will not overturn those findings unless the evidence preponderates against them.  Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001).  With respect to findings of fact that require the trial court to resolve conflicts in the evidence and determine the weight to be given the testimony of witnesses, we give great weight to the trial court's findings.  *Waller v. Evans*, No. M2008-00312-COA-R3-CV, 2009 WL 723519, *2 (Tenn. Ct. App. Mar. 17, 2009).  The trial court is in the best position to assess the credibility of witnesses.  *Id.*  We review a trial court's conclusions of law de novo with no presumption of correctness.  *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

A trial court's decision to allow the amendment of pleadings is reviewed under an abuse of discretion standard.  *Riley v. Whybrew*, 185 S.W.3d 393, 399 (Tenn. Ct. App. 2005).  There has been an abuse of discretion "when the trial court reaches a decision against logic that causes a harm to the complaining party or when the trial court applies an incorrect legal standard."  *Id.*  The trial court's decision will be upheld "so long as reasonable minds can disagree as to the propriety of the [trial court's] decision."  *Id.* (quoting *State v. Scott*, 33 S.W.3d 746, 751 (Tenn. 2000)).

ANALYSIS

---

[4]The $209,193.10 figure represents the $259,193.10 that flowed through Christine's account during the 28 months she lived with Emily and Jerry minus $28,000 for living expenses and $22,000 for paying off the loan on their pick-up truck.

1.

Tenn. R. Civ. P. 15.02 governs amendments to conform to the evidence:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. . . . If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice that party in maintaining the action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

In this case, the trial court had previously granted the defendants a continuance to take the deposition of Dr. Florence regarding lack of capacity. Although defense counsel noted at the beginning of the trial that the complaint did not allege undue influence, at the end of the first day, both attorneys mentioned their research on caselaw with respect to undue influence, and the trial court clearly stated its understanding that the case hinged on the existence of a confidential relationship and undue influence.

At the end of the trial, defense counsel objected to the plaintiff's motion to amend the pleadings. Defense counsel emphasized its right to have notice of the issues being tried, but the trial court noted the previous continuance to allow the defense to take Dr. Florence's deposition. The court asked defense counsel, "what prejudice is there at this point since we continued it the first time to give you a chance to rebut a new theory that you knew at that time?" The defendants did not assert any prejudice or request another continuance to respond to the plaintiff's evidence.

Under the circumstances, we cannot say that the trial court abused its discretion in granting the plaintiff's motion to amend the complaint. The issue of undue influence was tried by consent of the parties, and there was no prejudice to the defendants here.

2.

Under well-settled Tennessee law, "the *existence* of a confidential or fiduciary relationship, together with a transaction by which the dominant party obtains a benefit from the other party, gives rise to a presumption of undue influence that may be rebutted." *Matlock v. Simpson*, 902 S.W.2d 384, 385 (Tenn. 1995) (emphasis in original). Whether a confidential relationship existed is a question of fact. *Smith v. Smith*, 102 S.W.3d 648, 652 (Tenn. Ct. App. 2002). A confidential

-9-

relationship is defined as a relationship "which gives the dominant party dominion and control over the weaker party." *Id.* at 653.

A fiduciary relationship, such as that between attorney and client or guardian and ward, automatically constitutes a confidential relationship. *Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989). The relationship between a parent and an adult does not, by itself, create a confidential relationship. *Smith*, 102 S.W.3d at 653; *Mitchell*, 779 S.W.2d at 389. There must also be evidence of dominion and control. *Basham v. Duffer*, 238 S.W.3d 304, 311 (Tenn. Ct. App. 2007)*; In re Estate of Brevard*, 213 S.W.3d 298, 303 (Tenn. Ct. App. 2006). However, "a confidential relationship arises as a matter of law when an unrestricted power of attorney is granted to the dominant party." *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002); *Smith*, 102 S.W.3d at 653.

The defendants argue that the trial court erred in finding that a confidential relationship arose on the basis of a power of attorney that was never exercised. They rely on the rule that "[n]o confidential relationship arises when an unrestricted power of attorney is executed but has not yet been exercised." *Parish v. Kemp*, 179 S.W.3d 524, 531 (Tenn. Ct. App. 2005) (citing *Childress*, 74 S.W.3d at 329). There are several problems with the defendants' argument. Emily testified that she signed her mother's name to checks before and after execution of the power of attorney. The fact, cited by the defendants, that Emily did not sign her own name as attorney-in-fact does not mean she was not acting as her mother's attorney-in-fact. Emily also admitted during her testimony that she exercised the power of attorney, although not for the transactions at issue in this case. This court has previously acknowledged that a confidential relationship might arise based upon a power of attorney that was exercised but not used for the disputed transactions. *See id.*, 179 S.W.3d at 532.

We need not, however, resolve the issues presented by the defendants' power of attorney argument because the trial court based its finding of a confidential relationship upon multiple factors, not just on the existence of a power of attorney. In ruling from the bench, the court made the following statements:

> There's no doubt in my mind that a confidential and/or a fiduciary relationship existed between [Emily Wimley] and Ms. [Christine] Wimley. There's a power of attorney. There's a dependence upon them for her lifeblood, house to live in, basically turned everything over to her at some point in time for her to take care of her. So in my opinion you have a fiduciary relationship, confidential relationship established here.
> . . . .
>
> So that's what I meant when I said earlier I think it's clear that a confidential and fiduciary relationship was established. Whether it's the power of attorney, whether it's the fact that she depended upon them and turned all her money over to them to handle her affairs, the fact that she lived with them, the fact that she depended upon

them to get her around, you know, she gave cars to . . . all that creates that confidential–you've got a dominant party in this case.

Thus, the trial court considered all of the circumstances, not just the existence of the power of attorney, in finding a confidential relationship between Emily and Christine.

We give great deference to the trial court's finding of fact concerning the existence of a confidential relationship. *Smith*, 102 S.W.3d at 651. The evidence does not preponderate against the trial court's finding that a confidential relationship existed.

A confidential relationship coupled with "a transaction by which the dominant party obtains a benefit from the other party" creates a presumption of undue influence. *Matlock*, 902 S.W.2d at 385. Since Emily had a confidential relationship with Christine and received a benefit from the transactions at issue, there is a presumption of undue influence. This presumption may be rebutted only by "clear and convincing evidence of the fairness of the transaction." *Id.* at 386. The burden of proof shifts to the dominant party to show that the transaction was fair and was not a result of undue influence. *Thompson v. Thompson*, No. W2008-00489-COA-R3-CV, 2009 WL 637289, *10 (Tenn. Ct. App. Mar. 12, 2009). The determination as to whether the dominant party exerted undue influence is a question of fact. *Waller*, 2009 WL 723519, at *9.

What kind of proof is required to rebut the presumption of undue influence? The weaker party's receipt of independent legal advice is one way of showing fairness. *Richmond v. Christian*, 555 S.W.2d 105, 107-08 (Tenn. 1977). In fact, proof of independent legal advice may be required in certain cases.[5] *Id.* at 108. Otherwise, the court is to consider all of the evidence and apply "sound principles and good sense" in determining whether the transaction was fair. *Childress*, 74 S.W.3d at 329; *see also Waller*, 2009 WL 723519, at *9. In cases in which a presumption of undue influence arises from the existence of a confidential relationship, a court may consider "a lack of suspicious circumstances as evidence to rebut an automatic legal presumption of undue influence." *Parish v. Kemp*, No. W2007-02207-COA-R3-CV, 2008 WL 5191291, *6 (Tenn. Ct. App. Dec. 11, 2008) (perm. app. denied June 15, 2009). In the context of wills, the courts recognize that suspicious circumstances of undue influence may include the following:

(1) the existence of a confidential relationship between the testator and the beneficiary; (2) the testator's physical or mental deterioration; (3) the beneficiary's active involvement in procuring the will; (4) secrecy concerning the will's existence;

---

[5] In *Richmond*, the court noted:

Independent advice is ordinarily required where it is a reasonable requirement and where the circumstances are such that it would be difficult to show the fairness of the transaction without proof of independent advice, particularly, where the donor is impoverished by the gift in question or the gift seems to be unnatural under the circumstances of the case.

*Richmond*, 555 S.W.2d at 108.

(5) the testator's advanced age; (6) the lack of independent advice in preparing the will; (7) the testator's illiteracy or blindness; (8) the unjust or unnatural nature of the will's terms; (9) the testator being in an emotionally distraught state; (10) discrepancies between the will and the testator's expressed intentions; and (11) fraud or duress directed toward the testator.

*Id.* (citing *Kelley v. Johns*, 96 S.W.3d 189, 196 (Tenn. Ct. App. 2002)).

In this case, the defendants argue that Christine was capable and aware of what she was doing in making the disputed transfers to Emily. They point to Christine's ability to initiate and participate in the malpractice lawsuit and the present lawsuit as well as the multiple witnesses who saw no indication that she was impaired when she executed her will and durable power of attorney, when she withdrew money from her account, and when she signed the deeds to transfer real property. Further, the defendants cite testimony and recorded telephone conversations in support of their contention that Christine intended to give the property and money to her daughter. The trial court, however, placed great significance upon the evidence of Christine's diminished capacity to make decisions "of her free will" by virtue of her mental impairments, frailty, and age. Earlier in the hearing, the court also pointed out that the transactions at issue, by which Emily received all of her mother's estate with the exception of the future direct deposits, contradicted the intention she expressed in her will of dividing her estate equally among her three children.

The trial court's finding that the defendants did not rebut the presumption of undue influence by clear and convincing evidence required the trial court to weigh conflicting evidence and witness credibility, assessments for which we give great deference to the trial court. We cannot say that the evidence preponderates against the trial court's finding.

CONCLUSION

We affirm the trial court's decision. Costs of this appeal are assessed against the appellants, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

-12-