FILED

10/31/2017

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 20, 2017 Session

## KIMBERLY VAN FLOYD ET AL. V. LISA A. SHIRLEY AKINS ET AL.

Appeal from the Chancery Court for Monroe County
No. 16698     Jerri Bryant, Chancellor

_____

No. E2015-01737-COA-R3-CV

_____

This case concerns a dispute involving Lisa Akins, Kimberly Floyd, and Donna Helms, the three daughters of Eldon Shirley (the deceased).  The initial dispute regards a deed from the deceased to Akins, reserving a life estate.  Prior to the execution of the deed, the deceased executed a power of attorney appointing Akins as his attorney-in-fact. Thereafter, Floyd filed this action to set aside the deed on the ground of undue influence. She also alleged that Akins converted other assets of the deceased.  Helms later filed an intervening complaint adopting the allegations in Floyd's complaint.  Helms prayed that the real property deeded to Akins be declared a resulting and/or constructive trust.  Akins filed a counterclaim alleging that Helms was indebted to her.  Akins asked the court to compel Helms to file an accounting of the funds in dispute.  The trial court bifurcated the trial.  It first heard the undue influence claim.  The court held that the deed was procured by the undue influence of Akins.  The second stage of the trial involved the status of other assets and accounts.  The court determined that specific payments to Helms were loans.  The court found that other payments to and charges made by Helms involved no promise to repay and were gifts or payments for the care of the deceased.  Akins appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Joseph J. Levitt, Jr., Knoxville, Tennessee, for the appellant, Lisa A. Shirley Akins.

Melanie E. Davis, Maryville, Tennessee, for the appellee, Kimberly Van Floyd.

Martha Meares, Maryville, Tennessee, for the appellee, Donna Kay Helms.

# OPINION

## I.

In May 2003, the deceased's wife, Evelyn Shirley, passed away. Upon his wife's death, the deceased became the sole owner of ninety acres of farm land (the farm property). Prior to his wife's death, the deceased, due to his poor health, was totally dependent on her. After her death, the daughters agreed that the deceased would not be able to take care of himself. They agreed that he needed to move to Tennessee where his daughters lived. The deceased moved to Tennessee to live with Akins on the farm property.

On June 4, 2003, Akins took the deceased to his bank where he added her to his bank account as a joint account holder with right of survivorship. On July 17, 2003, the deceased executed a power of attorney designating Akins as his attorney-in-fact. That same day, the deceased executed a deed conveying the farm property to Akins. He reserved a life estate. Prior to his death, multiple assets belonging to the deceased were placed in Akins's name, including a truck, a mobile home, and $50,000 in certificates of deposit which had been purchased with his funds.

Beginning in 2003 and for a number of years, Akins and the deceased provided financial assistance to Helms. This assistance came in the form of money from the joint bank account, money from Akins's personal bank account, and charges by Helms on a credit card in Akins's name. Checks were written to Helms from the joint account both before and after the deceased passed away. Some of the checks contained a notation indicating that they were loans while other checks had no such notation.

On September 4, 2007, Akins wrote a check payable to cash from the joint account for $10,000. This distribution was authorized by the deceased. It was to be used by Helms's daughter to purchase a car. Akins, however, determined that Helms's daughter did not need a car. She never used the money to purchase the vehicle nor was the money returned to the deceased.

The deceased held an individual retirement account with Edward Jones. In 2009, he designated Floyd as the sole beneficiary of the account.

On February 16, 2010, the deceased passed away. On June 4, 2010, Floyd filed a complaint seeking to set aside the deed conveying the farm property to Akins. She alleged that a confidential relationship existed between Akins and the deceased and that Akins made fraudulent representations to the deceased. She claimed that Akins told the deceased that Helms wanted to sell the farm property and that, if he deeded it to Akins, she would ensure that the property was not sold. She also asserted that Akins told the deceased that deeding the property to Akins would protect it in case he was ever placed in

- 2 -

a nursing home. Floyd asked the trial court to set aside the deed to the farm property on the basis of undue influence or for want of consideration. Floyd also asserted that Akins transferred assets of the deceased to herself. Floyd asked the court to order Akins to provide an accounting of all assets of the deceased that came into her possession. She sought a judgment for conversion of the deceased's assets.

On August 9, 2011, Helms filed an intervening complaint. She adopted the allegations in Floyd's complaint. She also asked the court to declare the farm property a resulting and/or constructive trust.

On November 2, 2011, Akins filed a counterclaim. In her counterclaim, she alleged that she loaned Helms money and allowed her to use her credit card. She asked the court to grant her credit for the value of payments made to Helms and charges made by Helms on Akins's credit card. She also claimed that Helms and Floyd each received cash and property from their parents in excess of one-third of the value of the assets she received from their parents.

In the first phase of the trial, the court heard the issue of undue influence with respect to the deed to the farm property. On July 12, 2013, the trial court entered an order setting aside the deed to the farm property on the basis of undue influence. The court found that the execution of the power of attorney in favor of Akins created a confidential relationship between Akins and the deceased. The court also found numerous suspicious circumstances in the way Akins handled the deceased's affairs and found that the deceased was in a deteriorating mental and physical condition. Based on the circumstances surrounding the execution of the deed, the trial court set aside the deed to the farm property.

On August 7, 2015, the trial court entered an order resolving the remaining issues. The court also filed a master asset list that classified each asset as an estate asset or a non-estate asset. Pertinent to this appeal, the trial court classified the following assets: (1) three checks totaling $3,000 written to Helms prior to the deceased's death were loans and returnable as assets of the estate; (2) a $10,000 check authorized by the deceased to purchase a vehicle for Helms's daughter and deposited into Akins's personal bank account is an estate asset and should be returned to the estate; and (3) the deceased's Edward Jones account was a gift to Floyd and is a non-estate asset. The court also found that the parties stipulated that a single wide trailer, a modular home, and land in Scottsboro, Alabama are assets of the estate. The court determined that Helms owed Akins $1,000 for living expenses that Akins paid to her. Finally, the court found that there was no agreement for Helms to repay Akins for transfers from Akins's personal bank account to Helms's bank account or for Helms's use of a credit card for which Akins was responsible. Akins appeals.

**II.**

Akins raises the following issues:

> Whether the deed recorded on August 2, 2003, from the deceased to Akins reserving a life estate was obtained as a result of undue influence, and thereby void;
>
> Whether the court should have awarded Akins $14,738.93 instead of $3,000 for checks written to Helms from the joint account while Helms was living on the farm property prior to the death of the deceased;
>
> Whether the trial court should have awarded Akins $7,500 from Helms for checks Akins wrote to Helms after the death of the deceased from the joint account;
>
> Whether the court should have awarded Akins $13,300 from Helms for bank transfers from Akins's bank account to Helms's bank account after Helms filed bankruptcy;
>
> Whether the $10,000 that was intended to purchase a car for Helms's daughter should be returned to the estate by Helms or by Akins;
>
> Whether the court should have awarded Akins $17,310.20 from Helms for the use of Akins's credit card;
>
> Whether the court erred in awarding the Edward Jones investment account to Floyd instead of to the estate or one-third to Akins;
>
> Whether the court erred in finding that the parties stipulated that the single wide trailer, modular home, and Scottsboro land are all part of the estate; and
>
> Whether the court should have permitted each co-plaintiff to cross-examine each plaintiff and each plaintiff's witness.

**III.**

In this non-jury case, our standard of review is de novo upon the record of the proceedings below; however, the record comes to us burdened with a presumption of

- 4 -

correctness as to the trial court's factual determinations, a presumption we must honor unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); **Wright v. City of Knoxville**, 898 S.W.2d 177, 181 (Tenn. 1995). There is no presumption of correctness as to the trial court's legal conclusions. **Kendrick v. Shoemake**, 90 S.W.3d 566, 569 (Tenn. 2002); **Campbell v. Florida Steel Corp.**, 919 S.W.2d 26, 35 (Tenn. 1996).

## IV.

### A.

On appeal, Akins argues that the trial court erred in setting aside the deed to the farm property on the basis of undue influence. She claims that the deceased was competent and strong willed when he executed the deed. She argues that the deceased's prescribed medication and abuse of alcohol did not affect his will or ability to execute the deed. Akins also asserts that the deceased was not completely reliant on her and was still writing checks and making purchases on his own. According to Akins, she did not tell the deceased that the farm property would go to a nursing home if he did not transfer it to her but Akins noted that information would be good for him to have. With respect to the execution of the power of attorney and the deed, Akins claims that she did not go to the attorney's office with the deceased when he executed these documents and did not influence their execution. Finally, she asserts that the deed was delivered before the power of attorney became effective, and there is no presumption of undue influence in the case.

Akins claims that the doctrine of laches should apply to bar the action to set aside the deed to the farm property. She argues that the deed was executed in August 2003, but Floyd waited seven years, until June 2010, to file the action challenging the deed. Akins claims that, because of the lapse in time, the deceased could not testify about his intentions and those involved in the execution of the deed had no memory of it. She claims that honoring the deed is fair to the deceased.

### B.

The trial court found that the execution of the power of attorney from the deceased to Akins created a fiduciary relationship. In its July 12, 2013, order, the court initially found that the execution of the power of attorney created a presumption that any transfer from the deceased to Akins was procured by undue influence and that the burden was on Akins to rebut that presumption. The court, however, later amended and corrected its order "to reflect the execution of the power of attorney creates a confidential relationship but the execution alone does not create a presumption of undue influence."

The court found that, in addition to the confidential relationship, there were numerous suspicious circumstances. The court found the following suspicious

circumstances: (1) Akins's statement to the deceased that deeding her the property would keep a nursing home from getting it; (2) Akins's statement to the deceased that she would divide the farm property equally between the daughters; (3) the medications the deceased was taking along with his dependence on Akins made him susceptible to undue influence; (4) the deceased's depression after the death of his wife predisposed him to rely heavily on Akins; and (5) the deceased was abusing alcohol and prescribed Xanax and hydrocodone, which weakened his will. The court concluded that "[a]ll of these facts amount to suspicious circumstances such that the court finds [Akins] unduly influenced [the deceased] in his financial dealings to her benefit." Akins also failed to prove that the deceased received any independent advice. There were independent witnesses that testified that the deceased's intention was always that the farm property be divided equally and that the deceased was upset when he felt that Akins would not honor his wishes. The court found against Akins on credibility and found evidence of Akins's willingness to manipulate the deceased. Based on the confidential relationship accompanied by suspicious circumstances, the trial court held that Akins unduly influenced the deceased. As a consequence, the court set aside the deed to the farm property.

### C.

"Courts apply the doctrine of undue influence 'when one party, such as a grantee, is in a position to exercise undue influence over the mind and the will of another, such as a grantor, due to the existence of a confidential relationship.' " ***In re Estate of Price***, 273 S.W.3d 113, 125 (Tenn. Ct. App. 2008) (quoting ***Brown v. Weik***, 725 S.W.2d 938, 945 (Tenn. Ct. App. 1983)). "The most common way of establishing the existence of undue influence is 'by proving the existence of suspicious circumstances warranting the conclusion that the will was not the testator's free and independent act.' " ***Estate of Hamilton v. Morris***, 67 S.W.3d 786, 792-93 (Tenn. Ct. App. 2001). Commonly recognized suspicious circumstances include the following:

> (1) a confidential relationship between the testator and the beneficiary; (2) the testator's poor physical or mental condition; (3) the beneficiary's involvement in the procurement of the will in question; (4) secrecy concerning the will's existence; (5) the testator's illiteracy or blindness; (6) the unjust or unnatural nature of the will's terms; (7) the testator being in an emotionally distraught state; (8) discrepancies between the will and the testator's expressed intentions; and (9) fraud or duress directed toward the testator.

***Id.***

Although these circumstances are frequently applied "in the context of a will

contest—one of the more frequent actions that may involve an undue influence claim—much of it is generally applicable to a claim of undue influence in another context . . . ." *Lewis v. Lewis*, No. E2014-00105-COA-R3-CV, 2015 WL 1894267, at *8 (Tenn. Ct. App., filed April 27, 2015). This court has extended the application of these factors to set aside a deed on the basis of undue influence. *See Francis v. Barnes*, No. W2012-02316-COA-R3-CV, 2013 WL 5372851, at *6 (Tenn. Ct. App., filed Sept. 23, 2013). "[T]here exists no prescribed number of suspicious circumstances which must be met in order to invalidate an action . . . ." *Lewis*, 2015 WL 1894267, at *7.

"[I]f a contestant [proves] the existence of a confidential relationship, together with a transaction that benefits the dominant party to the relationship or another suspicious circumstance, a presumption of undue influence arises that may be rebutted only be clear and convincing evidence." *Kelley v. Johns*, 96 S.W.3d 189, 196 (Tenn. Ct. App. 2002). A confidential relationship exists "where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party." *Id.* "[W]here there is a 'confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party, a presumption of undue influence arises, that may be rebutted only by clear and convincing evidence of the fairness of the transaction' " *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002) (quoting *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995)). "A confidential relationship is any relationship which gives one person dominion and control over another." *Id.* Undue influence involves "substituting the will of the person exercising it for that of [another]." *In re Estate of Hill*, No. E2006-01947-COA-R3-CV, 2007 WL 4224716, at *4 (Tenn. Ct. App., filed November 30, 2007). The essential question is whether the will is that of the person allegedly influenced or that of another. *Id.*

**D.**

While the record reflects that the power of attorney was not used by Akins in procuring the deed from the deceased, we do find, however, that there was a confidential relationship between Akins and the deceased. Prior to the death of the deceased's wife, the deceased was dependent on her as his caregiver. Upon her death, he was so distraught that he could not attend her funeral. Because of his dependence on his wife, the deceased moved in with Akins immediately after her death. At that time, he was unable to care for himself. He was in a state of deteriorating health and suffered from a multitude of health issues, including COPD, emphysema, and diabetes. He suffered from depression and was in a weakened state. These problems caused him to need the assistance and care of Akins. She had considerable influence over the deceased. Even if the deceased was not completely reliant on Akins as she claims and handled many of his own affairs, she exercised significant influence over him and he was quite reliant on her. Accordingly, we find that Akins exercised sufficient dominion, influence, and control

- 7 -

over the deceased to create a confidential relationship.

We also find that there were other suspicious circumstances. One common suspicious circumstance is the poor physical or mental condition of the grantor. As already discussed, the deceased suffered from many health problems. He had poor physical health to the extent that he moved in with Akins immediately after his wife's death. He also had a poor mental condition in that he suffered from depression and was prescribed medication for that.

Another frequently relied upon suspicious circumstance is the beneficiary's involvement in procuring the transaction in question. On this issue, the trial court made a credibility determination. Floyd and Helms alleged that Akins told their father that deeding her the farm property would keep it from going to a nursing home. With respect to this statement, the trial court specifically found Floyd and Helms credible. The trial court found that "[t]his statement was intended to influence the action of [the deceased]."

The trial court's credibility determinations are accorded great weight. The Supreme Court has stated the following:

> [A] reviewing court must give "considerable deference" to the trial judge with regard to oral, in-court testimony as it is the trial judge who has viewed the witnesses and heard the testimony. This is particularly true when the credibility of the witnesses and the weight assigned to their testimony are critical issues. Moreover, because there is no requirement that a trial court make express findings of fact regarding a witness's credibility, the absence of such findings does not alter the applicable standard of review. Indeed, the trial court's findings with respect to credibility and the weight of the evidence . . . generally may be inferred from the manner in which the trial court resolves conflicts in the testimony and decides the case.

*Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 733-34 (Tenn. 2002) (internal citations omitted). "[T]rial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Accordingly, the trial court's finding that Helms and Floyd were credible in their allegation that Akins told the deceased that the nursing home would not get the farm property if he deeded it to her will not be revaluated by us. There is not clear and convincing evidence to the contrary.

We find that Akins's statement to the deceased that deeding her the farm property would keep it from going to a nursing home was made to influence him to deed the property to her. In addition to that statement, the trial court found that Akins "told [the deceased] she would divide the land equally between the three daughters. This was further intended to influence [the deceased]." We find that this statement was also made to procure the deed to the farm property. Based on the evidence before us, Akins was involved in procuring the transaction at issue by statements she made to influence the deceased. This is evidence of another one of the most frequently relied upon suspicious circumstances. *See Estate of Hamilton*, 67 S.W.3d at 792.

We also find evidence of other recognized suspicious circumstances warranting a finding of undue influence. One such circumstance is the deceased "being in an emotionally distraught state." *Id.* at 793. The deceased was emotionally distraught over losing his wife and executed the deed to the farm property less than two months after her death. The facts demonstrate that the deceased was in an emotionally distraught state at the time he executed the deed to the farm property. Finally, there was secrecy concerning the existence of the deed. While the deed was a public record after being recorded, Akins did not discuss the plan for the deceased to deed the property to her with Floyd or Helms. She did not discuss with them the transaction or reasons behind it. The record demonstrates that neither Floyd nor Helms discovered the existence of the deed until years after it was executed. It is clear that Akins kept the deed's existence from Floyd and Helms, and there was secrecy surrounding the execution of the deed.

In summary, the facts in this case clearly demonstrate the existence of a confidential relationship between the deceased and Akins. There is also evidence of numerous suspicious circumstances surrounding the procurement of the deed. The vast amount of evidence before us demonstrates that Akins unduly influenced the deceased. The trial court did not err in setting aside the deed to the farm property on the basis of undue influence.

## V.

## A.

Akins also challenges the trial court's failure to award her a judgment for numerous amounts paid to Helms over the years. She appeals the trial court's failure to award amounts for (1) checks written to Helms from the joint account prior to the deceased's death; (2) checks written to Helms from the joint account after the deceased's death; (3) transfers from Akins's personal bank account to Helms's bank account; and (4) charges made by Helms to a credit card. She also argues that Helms should be responsible for repaying a $10,000 check written from the joint account and deposited in Akins's personal bank account.

The trial court found the following with respect to the history of Helms receiving financial assistance from the deceased and Akins:

> Beginning in 2003 and over the years, Ms. Helms was given and/or borrowed funds from both [the deceased] and Ms. Akins. It was this activity by Helms that the court believes caused the greatest fracture in the relationships in this case. Ms. Helms would often complain to Ms. Akins about various problems, including her divorce. Ms. Helms testified that her sister would just give her money and [the deceased] would give her money, either as the result of request or gratuitously. Ms. Helms never repaid any money either to Ms. Akins or [the deceased]. . . . At or around the last year or so of [the deceased's] life, it became evident that the total funds given to Ms. Helms, because of her inability to manage money, some as payment to take care of her father, and some to insure that her children . . . were not too adversely affected by the divorce of Ms. Helms and her husband, exceeded Ms. Helms' share of the estate. It is noticed that Ms. Helms received a great amount of money between the benevolence of the [deceased] and . . . Ms. Akins, and as a result of her requests for loans. Unfortunately, neither [the deceased] nor Ms. Akins pursued repayment of any loans by Ms. Helms, apparently knowing that Ms. Helms either never intended to repay the monies borrowed or could not repay the monies borrowed. . . .

> Ms. Akins may not request repayment of any checks written prior to June 4, 2004 because the statute of limitations has run on any claim she or [the deceased] may have had against Ms. Helms prior to that date. The court further finds that Ms. Helms owes $3,000 for check numbers 1697, 1698, and 1707, all of which indicated that they were loans to Ms. Helms and were signed by Ms. Helms. No other items on Exhibit 55 indicate any agreement by Ms. Helms to repay.

> *     *     *

> . . . Items number 47 through 56 include checks written by either [the deceased] or Ms. Akins and given to Ms. Helms. Some of these checks are for her providing care for [the deceased] and some purport to be gifts, but there is no showing of any agreement to repay this money. The court

finds that any claim by the estate or Ms. Akins to this money should be dismissed.

* * *

. . . Item number 128 is presumed to be either a gift or payment for services rendered to Ms. Helms and is not properly recoverable by the estate. . . .

. . . Obviously, the parties did not treat each other in a manner that would have allowed collectability of debts between strangers. Being family members, Ms. Akins just expected her sister to do the right thing and repay her. . . . The court cannot overlook the fact that Ms. Akins continued to loan money to Ms. Helms after her original amounts were bankrupted and notes that Ms. Helms never paid any money back to either [the deceased] or her sister. . . . The court finds that Ms. Helms owed Ms. Akins $1,000 for living expenses paid to her on February 22, 2010. . . . While Ms. Helms denied making charges to the Chase account, the court finds that she did do so, but there is no proof of any agreement to repay those amounts.

In addition to noting the history and course of dealing between Helms and Akins, the court also made credibility determinations. Specifically, the court stated that "[t]he court finds credibility issues against both Ms. Helms and Ms. Akins." The court also found the following:

Challenges were filed to the acquisition of assets by the sisters at various points in time. Basically, when one sister challenged another's acquisition of an asset, there was a reciprocal action from another sister complaining of a transfer of assets to that sister. . . . [T]he court spent four days . . . in trial on the petition to set aside various conveyances. . . .

* * *

Only as a matter of spite did the sisters begin alleging that every other item that they had ever received from their parents was "ill gotten gains." This caused an astronomical increase in time and expense between these siblings and a loss of credibility by their ever shifting versions of what happened. . . .

- 11 -

As already discussed, a trial court's credibility determinations are given "considerable deference." *See* **Richards**, 70 S.W.3d at 733-34; **Wells**, 9 S.W.3d at 783.

In making its determinations of whether assets were part of the estate or must be repaid, the court made numerous credibility determinations. The trial court expressly made some credibility determinations, and some credibility determinations are shown by the trial court's decisions in the face of conflicting testimony. The majority of the issues on appeal deal with the understanding and agreement between Akins and Helms and money that exchanged hands between Akins and the deceased and Helms. The trial court heard the testimony of both Akins and Helms and made determinations about the intent and understanding of the parties based on its assessment of the witnesses. These credibility determinations and assessment of the trial testimony are given great weight.

**B.**

Akins argues that the trial court erred in finding that only three checks written to Helms from the joint bank account totaling $3,000 were loans. Akins claims the court should have awarded her $14,738.93 for checks written from the joint account to Helms prior to the deceased's death. She claims that all of these checks should be classified as loans. Akins argues that the law presumes that the checks were all written as loans to be repaid.

This Court has stated the following with regard to whether a check delivered constitutes a loan or a gift:

> The general rule is that the burden of proof rests on him who affirms, not on him who denies, and this burden never shifts.
>
> However, when there exists a presumption that arises from a particular fact, the presumption may serve to establish plaintiff's *prima facie* case, thereby forcing a defendant to answer the *prima facie* case.
>
> Tennessee law has established that a presumption arises from the delivery of a check. That presumption is that the delivery of a check indicates that the check is intended as a loan, and not as a gift.
>
> \*     \*     \*
>
> Because the law presumes the delivery of a check is a loan and not a gift, [proof of delivery] successfully ma[kes] out a *prima facie* case of a loan.

- 12 -

This presumption cause[s] the weight of the evidence to shift . . . . [A] claim that the loan was a gift is an affirmative defense. Thus, [the party asserting the defense] ha[s] the burden of proving the essentials of an *inter vivos* gift, which are (1) an intention of the donor to give and (2) delivery of the subject of the gift. The burden is upon the donee to clearly prove both of these elements and any doubts should be resolved against the finding of a gift.

*Gillia v. Gillia*, No. 02A01-9411-PB-00250, 1995 WL 702790, at *2 (Internal citations omitted; italics in original).

In this case, the parties do not dispute that the checks were delivered to Helms. Delivery of the checks gives rise to the presumption that the checks were loans. Thus, to show that the checks were gifts, Helms must demonstrate the intention of the deceased to give them as gifts. The trial court found evidence that only three of the checks constituted loans and that there was no agreement to repay the other amounts. The court found that only three checks were loans based on a notation on each check indicating that it was a loan. With respect to ten of the other checks at issue, the court found that "[s]ome of these checks are for providing care for her father and some purport to be gifts, but there is no showing of any agreement to repay this money." As already discussed, the court noted the extensive history of the financial dealings between the parties. The court determined that the years of financial assistance to Helms indicates there was never an agreement to repay or expectation of repayment.

The evidence does not preponderate against the trial court's finding that only three of the checks paid to Helms indicating that they were loans should be repaid. The disputed checks written prior to the deceased's death were written during the period from August 2008 to January 2010. There is conflicting testimony between Akins and Helms as to any agreement for Helms to move to the farm to care for her father, but the testimony does demonstrate that she moved to the farm in August 2008. Akins testified that she was not aware of an agreement between the deceased and Helms for her to receive periodic payments for staying on the farm property. She did testify, however, that she made payments from the joint account as dictated by the deceased.

Helms asserted that she moved to the farm property to take care of the deceased. She claims that Akins wanted her to move to the farm property to prevent the deceased from having to go to a nursing home. According to Helms's testimony, there was an agreement that she would receive payments for staying with and caring for the deceased. Thus, there is conflicting testimony about these payments to Helms, but the trial court's ruling demonstrates that it made credibility judgments in determining what amounts must be repaid.

- 13 -

In addition to the trial testimony, there is a letter from Akins to Helms that indicates that the deceased wanted Helms to be taken care of. According to this letter written by Akins, "[the deceased] did ask shortly before he died that the money left in his and my joint account be used to take care of the farm and to help [Helms] with her finances." This demonstrates that the deceased was concerned about Helms's financial wellbeing and that he wanted to help her financially.

Finally, the checks in the record demonstrate that some were specifically designated as loans while the majority of them were not. Three checks to Helms state in the memo line that they are loans. The remaining checks contain no such notation. This differentiation demonstrates that the pattern of checks to Helms were checks that were not loans meant to be repaid. The checks with the loan notation demonstrate that those amounts were to be repaid. The evidence demonstrates that the remaining checks were written to Helms for some other purpose.

The trial court did not err in finding that only three checks were loans. The evidence before us demonstrates that Helms moved to the farm property in August 2008. The checks at issue were written beginning that same month. There is a dispute as to whether Helms moved to the farm property to care for the deceased and whether there was an agreement that Helms would be paid for caring for the deceased. The evidence does demonstrate that there was a pattern of payments to Helms while she was living with the deceased. Some checks indicate that they were loans while others have no such indication. The testimony also demonstrates that the deceased wanted Helms to be taken care of financially. The substantial evidence before us and the pattern of checks to Helms demonstrates that there was no expectation of repayment as to the subject checks. Helms has rebutted the presumption that the checks were loans. The evidence does not preponderate against the trial court's award of $3,000 for checks written from the joint account to Helms prior to the deceased's death.

## C.

In addition to checks written prior to the death of the deceased from the joint bank account, Akins claims that the court should have awarded her $7,500 for checks written from the joint account to Helms after the death of the deceased. The trial court awarded Akins $1,000 for a check written to Helms on February 22, 2010 from Akins's personal bank account. Akins asks us to award $7,500 for seven checks written between February and September 2010 from the joint account.

In her brief, Akins argues that the court overlooked these checks. She claims that "[o]versight seems to be the only reason this $7,500 was not awarded to [her]." After the trial court entered its order, however, Akins filed a motion to alter and/or amend asking the court to award her $7,500 for these checks. At a hearing, she argued the following:

> As best we can tell, the Court made a ruling on Exhibit 61, which spelled out other checks that had marked on them loans that were submitted to . . . Helms after her bankruptcy, and we ask that the Court, based on Exhibit 61, that instead of just the one thousand dollars that there should be an additional seven thousand five hundred dollars awarded to . . . Akins . . . .

Akins then asked the court to award additional amounts based on a theory of unjust enrichment. The court denied the motion finding that it "brings up no facts that were not available to the parties at the time at the time of trial. The court carefully considered all these arguments during the original ruling and hereby denies the Motion to Alter or Amend."

Akins clearly brought the $7,500 at issue to the attention of the trial court. The court, however, ruled against her. Though Akins argues on appeal that the trial court overlooked these checks in its order, Akins acknowledged before the trial court that as far as she could tell, the trial court did, in fact, rule on these items. Akins's current claim that the trial court overlooked these items is disingenuous and contrary to her previous position.

The majority of the checks written to Helms did not contain the "loan" notation. Beginning in February 2010, the checks written to Helms did contain this notation. At trial, Akins testified about putting the "loan" notation on these later checks to Helms. When asked why she started writing this on the checks, Akins stated "[b]ecause she said that [her attorney] wanted me to write loan on there because of the . . . divorce case . . . ." The testimony at trial demonstrates that it was not until this time that Helms's attorney advised her to have "loan" written on the checks to her. It seems to us that the court credited this testimony in refusing to award $7,500 for the seven checks written to Helms after the deceased's death.

The trial court found credibility issues with both Helms and Akins. On the issue of the seven checks written to Helms after the death of the deceased, the court failed to award these amounts to Akins. It is clear that, because the court did not award these amounts to Akins, the court determined that the payments were not loans. This finding demonstrates that the court found the testimony credible that Helms was advised to put the "loan" notation on the checks but that they were not actually meant to be loans. The evidence in the record demonstrates that there was a change in the pattern of checks written to Helms based upon the advice of her attorney. In addition to the pattern of financial dealings between the parties already discussed, this was evidence that the checks written to Helms after the deceased's death were not meant to be loans. The evidence does not preponderate against the trial court's failure to award $7,500 to Akins for checks written after the deceased's death.

**D.**

Akins also challenges the trial court's failure to award her amounts that were transferred from her personal checking account to Helms's bank account. In the face of the competing testimony regarding these transfers, the court made a determination that these amounts were not to be repaid by Helms to Akins.

On appeal, Helms argues that "these transfers when read in conjunction with the checks written to Helms from [the deceased] prior to his death . . . evidence a pattern of regular periodic payments to Helms in the amount of $1,000 every two weeks which Helms testified was compensation for services she provided while living on the farm . . . ." When analyzed in relation to the checks written to Helms from the joint account prior to the deceased's death, these transfers were made during a time period when checks were not being written to Helms from the joint bank account. The amounts of these transfers are very similar to the pattern of checks written to Helms from the joint account. The timing and pattern of these transfers to Helms indicates that it was a continuation of the previous pattern of money paid to Helms. The evidence does not demonstrate that there was an agreement to repay these amounts to Akins based on the pattern of conduct between the parties. Again, the parties dealt with each other in such a way that indicates that there was no expectation of repayment and no agreement for Helms to repay the disputed amounts. The evidence does not preponderate against the trial court's failure to award Akins $13,300 for transfers from her personal bank account to Helms's bank account.

**E.**

Prior to his death, the deceased authorized $10,000 to be used to purchase a vehicle for Helms's daughter. A check in that amount was written, but a vehicle was never purchased. With respect to that check, the trial court found as follows:

> Ms. Akins admitted that the $10,000 check written from the joint account . . . and placed in her credit union account was intended to purchase Lindsay Helms, granddaughter of [the deceased], an automobile. It was decided by Ms. Akins that Lindsay did not need a car because she was driving her mother's car. The gift was never completed to Lindsay in contradiction of the admitted terms by [the deceased] and is properly returnable to the estate.

(Underlining in original.)

Akins argues that Helms, rather than her, should be responsible for returning the $10,000 to the estate rather than her. On the master asset list that Akins filed with the

- 16 -

trial court, she classified these funds as follows: "Estate – all of these funds were loaned to Donna Helms over time on instructions of Eldon Shirley." Helms, however, classified the funds on her master asset list as estate property and claims that "Lisa Akins wrote the check to herself, a commingling of [the deceased's] assets with her personal assets while she was [his] [p]ower of [a]ttorney."

The record, however, indicates that this disputed amount includes the same transfers from Akins's personal account to Helms's bank account that we have already addressed. At trial, Akins testified as follows with respect to the $10,000:

> Q. When was the first time that any part of that original ten thousand dollars was disbursed to anyone, if it was ever disbursed?
>
> A. It – it was disbursed when it matured a year later from '07.
>
> Q. And what caused a disbursement then to be made?
>
> A. The – the amount of loans made to Donna Helms?
>
> Q. By whom?
>
> A. By myself as directed by [the deceased].
>
> Q. When was the first time that you made any disbursement out of the ten thousand dollars or to be charged against that ten thousand dollars at the request of your father . . . or direction of [the deceased]?
>
> \*  \*  \*
>
> A. Okay. That would have been 9-24-08.
>
> Q. And what was the first disbursement?
>
> A. One thousand dollars.

We have already addressed that transfer of funds. In the immediately preceding section V. (D.) of this opinion, we found that the evidence did not preponderate against the trial court's failure to order Helms to repay transfers from Akins's personal bank account to Helms's bank account. One of the transfers Akins asked this Court to award was $1,000 on September 24, 2008, the same date and amount Akins testified at trial was from the

- 17 -

$10,000 at issue here. Akins simply tries to frame the same issue in a different light.

The evidence demonstrates that Akins wrote a check for $10,000 that was intended to purchase a vehicle for Helms's daughter. That check was deposited into Akins's personal bank account. The evidence is undisputed that a vehicle was never purchased for Helms's daughter. Akins now argues that the $10,000 was disbursed to Helms as various loans beginning on September 24, 2008. It is clear that Akins deposited the $10,000 into her checking account. The trial court ordered that that amount should be returned to the estate. Even if Akins paid certain sums to Helms, we have found that those amounts were not to be repaid. We hold that Akins is responsible for returning the $10,000 to the estate that she deposited in her personal bank account.

## F.

Akins challenges the trial court's failure to award her money for charges Helms made to a credit card in Akins's name. Akins claims that there was an agreement for Helms to repay her for the charges she made to the credit card.

As previously discussed, the trial court's assessment of the testimony at trial is given considerable deference. Even if a court does not make specific credibility determinations, these findings can generally be inferred from the way the court resolves the issues. *Id.* In this case, the trial court found credibility issues with both Akins and Helms. With respect to Helms's use of the credit card, the trial court found that "while . . . Helms denied making charges to the Chase account, the court finds that she did do so, but there is no proof of any agreement to repay those amounts."

At trial, Akins testified as follows:

Q. . . . [W]as there a Chase credit card with [Helms's] name on the card?

A. [Helms's] name was on the card, yes.

Q. And were you responsible for that debt?

A. Yes, I was.

Q. Was she responsible for that debt?

A. She was supposed to be because – to me, but not to the credit card company.

The court clearly did not find Akins credible on this issue because the court found

- 18 -

that there was no agreement for Helms to repay charges made to the credit card. The record is not clear why Helms had a credit card in her name for which Akins was responsible. The record does demonstrate, however, that Akins assumed responsibility for the charges to the account by having the account in her name. Additionally, there is no testimony as to why Akins would be carrying the account that Helms had access to with her own credit card. Based on the testimony, however, Akins was responsible for the account and received the bills for the account. She was free to close the account at her discretion. There is no proof before us of an agreement for Helms to repay the charges she made to the credit card. The evidence does not preponderate against the trial court's finding that there was no agreement for Helms to be responsible for and repay charges she made to the credit card.

<strong>VI.</strong>

Akins challenges the trial court's finding that the deceased's Edward Jones investment account was a gift to Floyd and that she is not entitled to any portion of that account. She asserts that the deceased always desired his assets be divided equally between his three daughters. She claims that "[t]his could only be done if the Court had directed that the Edward Jones account had been directed to be paid over to the Estate, or at least give Akins credit for one-third of it."

With respect to the Edward Jones account, the trial court found the following:

> Ms. Floyd avoided the conflict and the issues that predominantly characterized the relationship of Ms. Helms and Ms. Akins. Ms. Floyd received as a gift from her father the Edward Jones account at his death. The court has previously found [the deceased] was competent, and there has been no showing of any undue influence or that he was incompetent at the time he listed Ms. Floyd as a beneficiary of that account. The court therefore dismisses any claims by Ms. Akins against Ms. Floyd concerning that account.

At trial, Akins's testimony regarding the Edward Jones account was as follows:

> Q. Can you tell me what your position is regarding the transfer of the Edward Jones from [the deceased] to Kim Floyd?
>
> A. If that's what my father wanted to do, he did it.
>
> Q. And is it your position in this case that you're contesting that?

A. I am contesting it.

Q. And on what grounds?

A. On the grounds that – that if – that my father allocated his estate as he wanted, and he – she received this because of her badgering him over the telephone . . . .

Q. But would you agree that when he made her the beneficiary that that was a free and independent act that he did regardless of whether or not she wanted her inheritance or not?

A. Everything my father did was free and independent.

\* \* \*

Q. Well, my question is that in this case you have taken the position that the transfer of the Edward Jones to Kimberly Floyd was a gift from the [deceased]; is that correct?

A. That's correct.

\* \* \*

Q. What do you contend Kim Floyd did to influence the transfer of this asset?

A. She stopped visiting [the deceased] when she learned about the deed transfer in February 2008, and she called him frequently and harassed him, and he was in a lot of turmoil over her harassment over the telephone.

Other than alleging that Floyd's harassment of the deceased was the reason for her designation as the beneficiary of the Edward Jones account, Akins provides no grounds on which to deprive Floyd of the benefit of the account. Other than simply referring the Court to the law of unjust enrichment without explaining its application to this issue, Akins provides no legal basis for finding that the account designating Floyd as the sole beneficiary should be property of the estate.

It is undisputed that the deceased designated Floyd as the sole beneficiary of the Edward Jones account. There is no evidence that this designation was procured by any

undue influence. The deceased's clear intention of designating Floyd as the beneficiary was to make a gift to her. There are no facts to dispute this intention other than Akins's claim that Floyd harassed the deceased into gifting her the account. We find no legal theory for invalidating the designation of Floyd as the beneficiary of the Edward Jones account. The evidence does not preponderate against the trial court's finding that the Edward Jones account was a gift from the deceased to Floyd.

## VII.

The trial court found that the parties stipulated that a single-wide trailer, a modular home, and land in Scottsboro, Alabama were all part of the estate. On appeal, however, Akins claims that the trial court erred in finding that the parties stipulated that these items are part of the estate. She now claims that these are non-estate items.

During the trial, the following exchange took place between the trial court and Akins's attorney:

> MR. LEVITT: With respect to item 2, which is the single-wide trailer –
>
> * * *
>
> MR. LEVITT: That that is the single-wide trailer, and we say the title to that goes with the real estate, and we had listed as non estate title in the name of Lisa Akins. Your honor has already ruled on that, but the single-wide trailer is part of the real estate.
>
> THE COURT: So we can move on past that one.
>
> MR. LEVITT: The modular home is the same situation.
> . . .

From this exchange, we find that Akins stipulated that the title to the single-wide trailer and the modular home goes with the title to the farm property. Having set aside the deed to the farm property to Akins, the farm property is now part of the estate. Accordingly, because Akins stipulated that the single-wide trailer and modular home are part of the real estate and the real estate is part of the estate, those items are part of the estate by this stipulation. We hold that the trial court did not err in finding that the parties stipulated that the single-wide trailer and modular home are part of the estate.

With respect to the Scottsboro land, Akins classified the land on her proposed master assets list as "Non-Estate, is Heirs' ." The trial court clarified the classification

during the following exchange with Akins's counsel:

> THE COURT: Let me go back to . . . the Scottsboro land. When you say non estate is heirs, I'm not sure what that means. Do you mean that is already, by operation of law, vested in the beneficiaries of the estate?
>
> MR. LEVITT: Best of my knowledge that's Alabama law, but I'm not sure about that. It's vacant land, three acres. I don't believe there's any improvement on it. It's in Alabama and nothing's been done about it.
>
> *       *       *
>
> MR. LEVITT: But, as I suspected, in Your Honor's court the estate part of these proceedings may be insolvent, and if it's insolvent then, at least under Tennessee law, that three acres in Alabama would become part of the estate.
>
> THE COURT: That just means there's not a dispute for the parties today for me to decide on the land.
>
> MR. LEVITT: That's deferred to owning. That's my opinion.

Based upon this exchange, we find that Akins did stipulate to the classification of the land in Scottsboro, Alabama. According to her position, the land either vested in the beneficiaries of the estate by operation of law or would become part of the estate if the estate is insolvent. Akins agreed that there was no dispute for the trial court to decide with respect to this land. We hold that the trial court did not err in finding that the parties stipulated to the ownership of the land in Scottsboro, Alabama.

## VIII.

Akins claims that the trial court erred in allowing each co-plaintiff to cross-examine each plaintiff and each plaintiff's witnesses with leading questions. At trial, Akins objected, asserting that examination of each witness called by either plaintiff should be treated as direct examination. The trial court overruled the objection. Akins argues that Floyd, Helms, and the estate "have identical interests in every aspect of the issues heard by the [c]ourt . . . ." We disagree.

Tenn. R. Evid. 611(c)(1) provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness's

testimony. Leading questions should be permitted on cross-examination." With respect to trial testimony, "[t]he court has wide discretion in controlling the form of questions . . . ." *State v. Hutchison*, 898 S.W.2d 161, 172 (Tenn. 1994). "It is well-settled that the propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge, subject to appellate review for abuse of discretion." *State v. Caughron*, 855 S.W.2d 526, 540 (Tenn. 1993).

At trial, when Akins objected to a line of questioning arguing that it should be treated as direct examination of a plaintiff's witness, the court stated that "I think they're separate parties – she gets to do the – her own cross-examination of a different party . . . ." In its discretion, the trial court found that the line of questioning was appropriate. Accordingly, the trial court overruled the objection. This was not an abuse of discretion by the trial court.

In this case, Floyd and Helms filed separate complaints and were represented by different attorneys. While their stance on many of the issues was the same, there was the potential that the position of Floyd and Akins on an issue could diverge. Each party was entitled to pursue her own strategy at trial, including which witnesses to call and what questions to ask the witnesses. We hold that the trial court did not abuse its discretion in treating Floyd and Helms as separate parties and allowing them to use leading questions in cross-examining the other party's witnesses.

## IX.

The judgment of the trial court is affirmed. The costs on appeal are assessed to the appellant, Lisa Shirley Akins. This case is remanded for enforcement of the trial court's judgment and for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE