IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 1, 2019

## STEPHEN SIMPSON ET AL. v. WILLIAM B. SIMPSON

**Appeal from the Chancery Court for Loudon County**
**No. 12461     Frank V. Williams, III, Chancellor**

_____

**No. E2018-01686-COA-R3-CV**

_____

Siblings appeal the trial court's refusal to set aside a deed conveying real property from their decedent father to their brother. The siblings also appeal the trial court's denial of their post-trial motion to consider purported newly discovered evidence. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and ANDY D. BENNETT, JJ., joined.

Kristopher D. Frye, Loudon, Tennessee, for the appellants, Alisa Bolt, and Stephen Simpson.

Loren D. Plemmons, Loudon, Tennessee, for the appellee, William B. Simpson.

### OPINION

#### BACKGROUND

On September 19, 2016, Plaintiffs/Appellants Stephen Simpson ("Mr. Simpson") and Alisa Bolt (Ms. Bolt, and together with Mr. Simpson, "Appellants") filed a complaint in Loudon County Chancery Court to set aside a quitclaim deed against their brother, William Simpson ("Appellee").[1] According to the complaint, the siblings' father, Tom Simpson ("Decedent"), executed a quitclaim deed in favor of Appellee on August 5, 2015, for no consideration. The property conveyed by the deed was a large piece of farmland that Decedent owned in Loudon County ("the farm" or "the property"). Decedent continued to reside on the property notwithstanding the conveyance. Shortly

_____

[1] Another brother was not a party to the proceeding and did not testify.

after execution of the deed, however, in September 2015, Decedent's health took a turn for the worse, causing him to fall. Decedent was hospitalized, then transferred to an assisted living facility. Decedent never returned to the farm before he passed away on May 15, 2016.

After Decedent passed away, Appellants alleged that they learned about the conveyance. Appellants asserted that the deed should be set aside on the basis of their father's diminished capacity and undue influence. The complaint also stated that Appellee misappropriated certain funds from Decedent in connection with an easement that was granted over the property. Appellee filed an answer denying the material allegations contained in the complaint.[2]

A trial occurred on April 13, 2018.[3] Appellee testified that he generally took care of his father's finances and person during the later years of Decedent's life, going so far as to hire a young neighbor to look in on Decedent and drive him around. Appellee's assistance included taking care of the farm property, including the cows owned jointly by Decedent and Appellee, paying bills for Decedent, and taking Decedent to have his taxes done. Appellee was a joint owner on both Decedent's personal and business accounts. According to Appellee, the only money taken from the accounts went to pay farm and living expenses. Although Appellee testified that he sometimes questioned Decedent about his spending, including a time when Decedent took out a loan to buy a skid steer, a piece of heavy farm equipment, allegedly for Mr. Simpson's use, Appellee testified that "it was [Decedent's] money. He did what he wanted to do."

Appellee admitted that he signed his father's name to the grant of temporary easement over some of the farm property on May 5, 2015. Appellee testified that Decedent asked Appellee to sign, as was his typical practice in many situations. According to Appellee, Decedent fully understood the transaction and agreed to allow the easement; the funds that resulted from the grant of the easement were placed into one of Decedent's joint accounts.

At some point,[4] Decedent and Appellee went to a lawyer to discuss having a will prepared. Although Decedent initially requested the meeting, Appellee testified that it was cut short by Decedent's physical health issues. As such, no will was ever drafted or executed.

Around July 2015, Appellee testified that his Father determined that he wanted to convey the farm to Appellee in an effort to ensure that the property was not sold and

---

[2] Appellee also filed a motion for summary judgment; no order adjudicating the motion is included in the record and Appellants state in their appellate brief that the motion was withdrawn by agreement.

[3] The separate claim of diminished capacity was apparently abandoned at trial, with the issues of capacity raised only as part of the undue influence claim. No issues on appeal have been raised about any claim for diminished capacity.

[4] According to other evidence in the record, this meeting occurred on or about May 27, 2015.

subdivided upon his passing. As such, Appellee contacted Southeastern Title Company to prepare a quitclaim deed to that effect. Decedent had no contact with Southeastern Title Company until the day the deed was signed on August 5, 2015; according to Appellee, Decedent asked Appellee to take care of the transaction because he had severe hearing impairment that made business-type calls difficult. On August 5, 2015, Decedent and Appellee drove to Southeastern Title Company and Decedent signed the deed conveying the entire farm property to Appellee.

On September 19, 2015, Appellee found Decedent on the floor of his home after a fall. Decedent was taken to a hospital by ambulance where he stayed until approximately September 24, 2015, when he was moved to an assisted living facility. Appellee testified that he changed the locks on the farm house approximately one day following Decedent's fall. According to Appellee, Decedent asked Appellee not to tell his other siblings about the fall. In October 2015, Decedent executed a power of attorney in favor of Appellee.[5]

Appellee testified that Decedent suffered from some physical health issues in the last years of his life, including severe hearing impairment and bowel incontinence. Appellee denied, however, ever being informed that Decedent was diagnosed with dementia prior to September 2015. Rather, Appellee testified that that on August 5, 2015, Decedent was not suffering from any form of dementia.

Norman Gryder testified that he was hired by Appellee to help Decedent around the farm for approximately five years prior to September 2015. Mr. Gryder testified that Decedent could not drive himself "in the month before" he was hospitalized, but that Decedent was still attempting to drive approximately two months prior to his hospitalization. Mr. Gryder confirmed that he drove Decedent to a law office at Appellee's behest to take care of "something about the farm"; Mr. Gryder did not stay for the meeting and was not privy to what was discussed. According to Mr. Gryder, he once asked Decedent what was to happen to the farm upon his death; Decedent responded that he wanted "it equal and four ways." Mr. Gryder testified that in the months before Decedent's hospitalization, Decedent "was not himself," but was "sick." Mr. Gryder did not elaborate as to whether this sickness was mental, physical, or both.

Mr. Simpson testified that he lived with Decedent from September 2012 to approximately November 2014. During this time, Mr. Simpson testified that he would cook and clean for Decedent, while Appellee would visit approximately once a month to pay bills. At some point, Mr. Simpson also helped Decedent purchase a skid steer; according to Mr. Simpson, the decision to make such a purchase was Decedent's and he signed all the necessary financial documents to do so. In November 2014, however, Decedent asked Mr. Simpson to leave the farm after a falling out; Decedent apparently believed that Mr. Simpson had taken some wood from the farm. According to Mr.

---

[5] Appellee explained that they were encouraged to do so by health care workers, but the power of attorney at issue was not a healthcare power of attorney.

Simpson this belief was one in a pattern of "unusual outbursts" that Decedent experienced in his later years. Like Mr. Gryder, Mr. Simpson testified that Decedent "wasn't completely himself" during this time. In particular, Mr. Simpson pointed to physical impairments and Decedent saying "off-the-wall stuff." Mr. Simpson admitted, however, that he had no interaction with Decedent around the time the deed was executed. Mr. Simpson also testified that while Decedent had only a fourth-grade education, he was an intelligent man. In addition, Mr. Simpson confirmed that Travis Thompson, a neighbor, helped out with Decedent after he moved out.

Ms. Bolt testified that she was close with both Appellee and Decedent prior to the events at issue in this case, but that Appellee's behavior changed things. Prior to the summer of 2015, Ms. Bolt testified that she visited Decedent two to three times per month. In the months leading up to the transfer, however, Ms. Bolt noticed a significant decline in Decedent's mental and physical faculties. With regard to the physical, Ms. Bolt explained that Decedent was incontinent, weak and feeble. Ms. Bolt was concerned about his mental status as well, as he had at some times allowed the house to become filthy and made a comment about how "rats were laughing at him."

When Decedent was hospitalized in September 2015, Ms. Bolt asserted that Appellee did not inform her of the hospitalization; rather she learned of the fall from a third-party. As such, there was a delay in her seeing her father until he had been moved to an assisted living facility; Decedent apparently blamed Ms. Bolt for the delay, causing some familial strife. Ms. Bolt agreed, however, that Decedent could not return home to the farm due to his physical condition. Ms. Bolt testified that Appellee also failed to inform the siblings about the conveyance of the farm until the deed was discovered following Decedent's death.[6] Ms. Bolt testified that she was surprised by the conveyance. Ms. Bolt's husband confirmed their surprise, as he testified that Decedent had once told a group of people that "the farm would go down to all of his kids" and that he did not intend on drafting a will.[7]

Anita Wilson testified that she prepared the quitclaim deed at issue in her capacity as a closing agent and processor for Southeastern Title Company. According to Ms. Wilson, Appellee initially contacted her about the preparation of a quitclaim deed and she completed the title work and necessary paperwork. When it came time to execute the deed, Ms. Wilson took the paperwork to the parking lot where Decedent was waiting. Ms. Wilson then engaged in light "chitchat[]" with Decedent, in an effort to "make sure that everybody knows what's going on." Ms. Wilson also generally explained the deed to Decedent, including the property description, the tracts, and the acreage. Although Ms.

---

[6] Ms. Bolt's husband testified that he grew suspicious following Decedent's death and found the deed though an online search. Although there was no dispute that the deed was the subject of public notice through the local newspaper, Ms. Bolt testified that she was unaware because she does not live in the town that the newspaper serves.

[7] Although Mr. Bolt testified that Ms. Bolt was present for this conversation, she did not confirm this testimony.

- 4 -

Wilson testified that Decedent was hard of hearing, she believed that he fully understood the transaction and that Decedent "did intend to convey the property to his son [Appellee]." Appellee was in the car during this interaction, but he did not participate. Ms. Wilson also testified that Decedent appeared to have clear cognitive thinking and sufficient mental capacity to engage in the contract. Finally, Ms. Wilson testified that it did not appear that Decedent was in any way coerced into executing the deed. Ms. Wilson admitted, however, that had she been informed that Decedent had previously been diagnosed with dementia, she would not have notarized Decedent's signature.

Regina Lindsey, Decedent's long-time neighbor and mail-carrier, also testified about Decedent's intentions and mental state. According to Ms. Lindsey, she saw Decedent nearly every day for a number of years. In approximately 2005, Ms. Lindsey inquired of Decedent whether the farm would be subdivided upon his death; Decedent responded that farm was not to be sold but was "going to go to [Appellee]." Over the years, the parties would sometimes discuss the issue again; each time, Decedent confirmed that the property was to go to Appellee upon his death. Ms. Lindsey verified that Decedent suffered a physical decline in the years before his death, but claimed that his mental capacity did not suffer to the point that he could not comprehend or make his own decisions. According to Ms. Lindsey, Decedent liked things done "[o]nly his way" and had no compunction in letting others know. Ms. Lindsey also described Decedent as independent up until shortly before he was hospitalized. Although there was no dispute that Mr. Gryder was often doing work at the farm, Ms. Lindsey testified that she only saw Decedent getting help from Appellee and Mr. Thompson in 2015.

Mr. Thompson, Decedent's neighbor for approximately fifteen years, detailed multiple conversations with Decedent over the future of the farm. First, approximately fifteen years before trial, Mr. Thompson attempted to buy a piece of the farm from Decedent. Decedent declined, noting that his intent was to keep the farm intact. Over the years, Decedent and Mr. Thompson had multiple conversations concerning the farm, all of which resulted in Decedent expressing his intention that the farm would pass to Appellee alone. Indeed, according to Mr. Thompson, Decedent explained his choice that his other two sons "would piddle it away" and Ms. Bolt only wanted the property for the money.[8] Decedent's intentions did not change in conversations that occurred "toward the end" of Decedent's life. Indeed, approximately one year prior to Decedent's death, he asked Mr. Thompson to take him to have the property transferred into Appellee's name. Mr. Thompson declined, however, stating that Appellee would need to take care of that issue. Finally, Mr. Thompson confirmed that immediately prior to Decedent's hospitalization, Decedent did not appear to be suffering from any mental weakness.

The deposition testimony of Hank S. Seo, M.D. was submitted as substantive evidence. Dr. Seo treated Decedent following his hospitalization on or about September 24, 2015. At that point, Dr. Seo noted that Decedent had already been diagnosed with

---

[8] There was no dispute that Ms. Bolt had previously declared bankruptcy on two occasions.

dementia by some other medical professional and had difficulty answering questions about his own history. As a result, Dr. Seo opined that Decedent was then suffering from severe Alzheimer dementia. Although such a condition often results from a gradual worsening over time, Dr. Seo declined to state whether Decedent was suffering in a similar fashion on August 5, 2015 when the deed was executed.

At the conclusion of the trial, the trial court issued an oral ruling in favor of Appellee. The trial court's order was later memorialized by written order filed April 30, 2018. Therein, the trial court found that while Decedent was suffering from some dementia as of August 5, 2015, the deed was the result of a long-term plan by Decedent to give the farm to Appellee and that he had not been influenced by anyone to make that decision. The trial court therefore dismissed Appellants' complaint in its entirety and ruled that all right title and interest in the real property at issue vested in Appellee by virtue of the August 5, 2015 quitclaim deed.

On May 25, 2018, Appellants filed a motion for new trial on the basis of newly discovered evidence. Specifically, the motion alleged that Appellants learned after trial that Decedent had in fact spoken with a lawyer in May 2015 and informed the lawyer of his intent to devise the farm to his four children equally. The lawyer asked Decedent to obtain a survey of the property; however, Decedent never returned and no will was drafted. The motion was accompanied by the affidavit of attorney Matthew B. Frère of Guyton & Frère detailing the May 2015 meeting in which Decedent discussed his intent to devise the property to all his children.

The motion also included affidavits of Appellants' counsel and Ms. Bolt concerning their diligent efforts to obtain this information prior to trial. According to these affidavits, upon learning about this meeting from Mr. Gryder in September 2017, Appellants' counsel tasked Ms. Bolt with calling the law office in hopes that she would be able to obtain more information that he would. Specifically, Appellants' counsel was concerned that should he call the law office, attorney client privilege might be invoked. Ms. Bolt called the law office, informed the receptionist that her father was deceased, and asked "whether they had prepared a will for him." The receptionist later called back and informed Ms. Bolt that Decedent had a consultation but no will was ever prepared. Thereafter, Appellee was deposed in March 2018 and testified that there was no conversation about his Father's intentions during the consultation.

Following the trial, however, Appellants' counsel stated that his clients "asked [him] to reach out to Guyton & Frère not for the purposes of obtaining new evidence, but in [a] desire to find some peace with the trial court's judgment." During a conversation that followed with Attorney Frère, Appellants' attorney learned the information that later became the basis of the motion for new trial. According to Appellants' counsel, had Appellee's deposition "disclosed the true substance of the meeting with Attorney Frère, [he] would have pursued this information prior to trial." The trial court denied the motion for new trial by order of August 21, 2018, ruling that the information was not newly

discovered but could have been procured through reasonable diligence prior to trial. Appellants thereafter filed a timely notice of appeal to this Court.

## ISSUES PRESENTED

Appellants raise two issues, which are taken and slightly restated from their appellate brief:

1. Whether the trial court erred in finding that Appellee overcame, by clear and convincing evidence, the rebuttable presumption of undue influence.
2. Whether the trial court erred in denying Appellants' motion for new trial.

## STANDARD OF REVIEW

This case was resolved following a bench trial. Under Rule 13 of the Tennessee Rules of Appellate Procedure, the trial court's findings of fact from a bench trial are reviewed "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). We give "great weight to a trial court's factual findings that rest on determinations of credibility." *Nashville Ford Tractor, Inc. v. Great Am. Ins. Co.*, 194 S.W.3d 415, 424 (Tenn. Ct. App. 2005) (citing *In re Estate of Walton*, 950 S.W.2d 956, 959 (Tenn. 1997)). A trial court's conclusions of law, however, are not entitled to a presumption of correctness. *Johnson v. Johnson*, 37 S.W.3d 892, 894 (Tenn. 2001).

## DISCUSSION

## I.

We begin first with whether the trial court correctly ruled that Appellee rebutted the presumption of undue influence. As explained by the Tennessee Supreme Court,

> [W]here there is a "confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party, a presumption of undue influence arises, that may be rebutted only by clear and convincing evidence of the fairness of the transaction." *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995) (citations omitted). A confidential relationship is any relationship which gives one person dominion and control over another. *See Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989).
>
> The burden of proof regarding a confidential relationship rests upon the party claiming the existence of such a relationship. *See Brown v. Weik*, 725 S.W.2d 938, 945 (Tenn. Ct. App. 1983). Once a confidential relationship has been shown and a presumption of undue influence arises, the burden shifts to the dominant party to rebut the presumption by proving

the fairness of the transaction by clear and convincing evidence. ***Matlock v. Simpson***, 902 S.W.2d at 386; *see* ***Gordon v. Thornton***, 584 S.W.2d 655, 658 (Tenn. Ct. App. 1979). To prove the fairness of the transaction, the dominant party may show that the weaker party received independent advice before engaging in the transaction that benefitted the dominant party. *See* ***Hogan v. Cooper***, 619 S.W.2d 516, 519 (Tenn. 1981); *see also* ***Richmond v. Christian***, 555 S.W.2d 105, 107–08 (Tenn. 1977) (proof that the donor received independent advice respecting the consequences and advisability of the gift) (citations omitted).

***Childress v. Currie***, 74 S.W.3d 324, 328 (Tenn. 2002) (involving an action to set aside a will); *see also* ***Floyd v. Akins***, 553 S.W.3d 469, 476 (Tenn. Ct. App. 2017), *perm. app. denied* (Tenn. Mar. 15, 2018) (applying the ***Childress*** undue influence analysis to an action to set aside a deed). In this case, the trial court found that a confidential relationship existed between Appellee and Decedent, coupled with a transaction that benefited Appellee, such that a presumption of undue influence arose. Neither party disputes the trial court's finding that a presumption of undue influence is at issue in this case. As such, we proceed directly to consider whether the presumption was rebutted by Appellee.

When a presumption of undue influence has arisen, "this Court has often considered a lack of suspicious circumstances as evidence to rebut an automatic legal presumption of undue influence." ***Parish v. Kemp***, 308 S.W.3d 884, 891 (Tenn. Ct. App. 2008) (citing ***Simmons v. Foster***, 622 S.W.2d 838, 841 (Tenn. Ct. App. 1981) (the evidence that decedent was capable and strong-willed overcame presumption of undue influence)). We have also recognized "that courts should refrain from prescribing the requisite type or number of suspicious circumstances that may invalidate a will[.]" Instead, the Tennessee Supreme Court has indicated that the determination should be based upon "the application of sound principles and good sense to the facts of each case." ***Childress***, 74 S.W.3d at 329. We have noted, however, that "the strength of rebutting the presumption varies with the circumstances of each case and the strength of the presumption of undue influence." ***Parish***, 308 S.W.3d at 890.

In determining whether the situation involves a lack of suspicious circumstances, it is helpful to first consider what circumstances this court has considered suspicious:

The suspicious circumstances most frequently relied upon to establish undue influence are: (1) the existence of a confidential relationship between the testator and the beneficiary; (2) the testator's physical or mental deterioration; and (3) the beneficiary's active involvement in procuring the will. ***In re Elam's Estate***, 738 S.W.2d 169, 173 (Tenn. 1987); ***In re Estate of Hamilton v. Morris***, 67 S.W.3d 786, 792 (Tenn. Ct. App. 2001); ***Fell v. Rambo***, 36 S.W.3d 837, 847–48 (Tenn. Ct. App. 2000). In addition to proof of a transaction benefitting the dominant

person in a confidential relationship, other recognized suspicious circumstances include: (1) secrecy concerning the will's existence; (2) the testator's advanced age; (3) the lack of independent advice in preparing the will; (4) the testator's illiteracy or blindness; (5) the unjust or unnatural nature of the will's terms; (6) the testator being in an emotionally distraught state; (7) discrepancies between the will and the testator's expressed intentions; and (8) fraud or duress directed toward the testator. ***Halle v. Summerfield***, 199 Tenn. at 454–57, 287 S.W.2d at 61–62; ***In re Estate of Maddox***, 60 S.W.3d at 89; ***Mitchell v. Smith***, 779 S.W.2d 384, 388 (Tenn. Ct. App. 1989); 1 *Pritchard on Wills* § 148, at 233.

***Kelley v. Johns***, 96 S.W.3d 189, 196 (Tenn. Ct. App. 2002). In addition to a lack of suspicious circumstances, courts have also considered evidence that the decedent was still capable of making her own decisions, *see* ***Jarnigan v. Moyers***, 568 S.W.3d 585, 594 (Tenn. Ct. App. 2018), *perm. app. denied* (Tenn. July 19, 2018), and the decedent had a "headstrong personality." *See* ***Parish***, 308 S.W.3d at 891. We have also noted that "[t]he overall fairness of a transaction is a consideration which can be material[.]" ***Ralston v. Hobbs***, 306 S.W.3d 213, 227 (Tenn. Ct. App. 2009). Like any other case, these factors may hinge on credibility, the trial court's findings on which are entitled to great weight on appeal. *See* ***In re Estate of Turner***, No. W2004-02123-COA-R3-CV, 2005 WL 2086028, at *10 (Tenn. Ct. App. Aug. 30, 2005) (affirming the trial court's ruling in large part based on credibility findings).

> As the Tennessee Supreme Court has stated
>
> [I]t is not influence that invalidates a conveyance or will but undue influence; that "(a) person has a right by fair argument or persuasion to induce another to make a will (sign a deed), and even to make it in his own favor," provided the influence is "exerted in a fair and reasonable manner, and without fraud or deception."

***Kelly v. Allen***, 558 S.W.2d 845, 847 (Tenn. 1977) (quoting *Pritchard on Wills*, §§ 130–31); *see also* ***Frank v. Fields***, No. E2016-00809-COA-R3-CV, 2017 WL 2304301, at *12 (Tenn. Ct. App. May 26, 2017) (citing ***In re Estate of Davis***, No. E2015-00826-COA-R3-CV, 2016 WL 944143, at *23 (Tenn. Ct. App. Mar. 14, 2016) ("[T]he issue was not whether the transactions were fair to Plaintiffs but whether the transactions fairly represented Decedent's free and independent will.")). The essential question is therefore "whether the will is that of the person allegedly influenced or that of another." ***Floyd***, 553 S.W.3d at 477; *see also* ***In re Estate of Hill***, No. E2006-01947-COA-R3-CV, 2007 WL 4224716, at *4 (Tenn. Ct. App., Nov. 30, 2007) (holding that undue influence involves "substituting the will of the person exercising it for that of [another].") (citation omitted).

We agree with Appellants that many of the aforementioned suspicious circumstances were present in this case. For example, there can be no dispute that

Appellee chose to keep the transfer of the farm secret until after Decedent's death. Likewise, Decedent was of advanced age and physically feeble at the time of the transfer. Appellee was also an integral part in the accomplishment of the transfer, although Decedent initially asked a third-party, Mr. Thompson, to take him to have the deed prepared. While the deed itself was explained to Decedent by Ms. Wilson, it does not appear that Decedent received any independent advice in reaching the decision to transfer the property to Appellee. Independent advice, however, is merely "one example, but not the only one," to show the fairness of a transaction. ***Richmond v. Christian***, 555 S.W.2d 105, 107–08 (Tenn. 1977).

Other suspicious circumstances are not present, however, such as Decedent being in an emotionally distraught state. Appellants also do not argue in their appellate brief that the terms of the transaction were unjust or unnatural: while the conveyance of the farm certainly deprived Decedent's other children of the bulk of his property that they would receive by virtue of intestate succession, the proof also showed that, compared to his siblings, Appellee was the person most involved in the farm.

The parties, dispute, however, whether the proof showed a number of other suspicious circumstances. For example, while Decedent was neither blind nor illiterate, the proof showed that he had little education and was nearly deaf at the time of the conveyance; despite these deficiencies, however, Decedent was shown to be an intelligent man who was fully explained the details of the conveyance by Ms. Wilson.

Another dispute involves whether the execution of the deed conformed to Decedent's stated intentions regarding the property's future. Here, Mr. Bolt and Mr. Gryder testified that Decedent's stated intent was to divide the property equally among all of his four children. In contrast, neighbors Mr. Thompson and Ms. Lindsey both testified that it was Decedent's stated intention on multiple occasions that the farm was to go to Appellee alone. The trial court expressly credited the testimony of Mr. Thompson and Ms. Lindsey, stating that based on this testimony, the court was "absolutely, positively convinced [Decedent's] execution of the quitclaim deed was the culmination of a long-term goal to convey his farm to [Appellee]." Indeed, the trial court found that Decedent had maintained this purpose for upwards of a decade until shortly before death.

Given the conflicting testimony on this issue, the trial court's findings largely rest on its credibility determinations. In a similar situation, this Court affirmed the decision of the trial court that the presumption of undue influence had been rebutted where the trial court credited the testimony of witness who stated that the decedent's choices were "unequivocally . . . made of her own free will independent of outside influence." ***In re Estate of Turner***, 2005 WL 2086028, at *10. Similarly, in this case, Ms. Lindsey testified that Decedent was such an "independent" man that he refused help on occasions. Other witnesses confirmed that the choice to leave the farm to Appellee was Decedent's alone.[9]

---

[9] Of course, Ms. Bolt's testimony contradicted this evidence, instead suggesting that Decedent

In the absence of clear and convincing evidence otherwise, we will not disturb the trial court's findings that rest on credibility. *In re M.L.D.*, 182 S.W.3d 890, 897 (Tenn. Ct. App. 2005). As such, the evidence does not preponderate against the trial court's finding that the execution of the deed was in conformity with Decedent's expressed intentions for the property. Consequently, an important suspicious circumstance, "discrepancies between the [deed] and the testator's expressed intentions," is lacking in this case. *Kelley*, 96 S.W.3d at 196.

The question of whether Decedent was mentally impaired at the time of the transaction so as to create another suspicious circumstance was also sharply disputed at trial. Appellants submitted the deposition testimony of Decedent's treating medical provider, who began treating Decedent on or about September 24, 2015, approximately six weeks following the transaction. According to the medical records that the physician reviewed, Decedent had been previously diagnosed with a mental impairment as of his treatment in September 2015. While the physician was comfortable saying that Decedent was suffering from a mental impairment in late September 2015, he expressly refused to opine as to whether Decedent was impaired in August 2015 when the deed was executed. Testimony from lay witnesses regarding Decedent's mental state fails to resolve this dispute. While Ms. Bolt testified that her father was suffering from a severe impairment around August 2015, Appellee and Mr. Thompson testified that Decedent's mind remained relatively sharp during this time.

The trial court found that Decedent was indeed suffering from dementia at the time that he executed the quitclaim deed, but that such a diagnosis was common among people of Decedent's age, and that Decedent "had not lost the ability to function." While Decedent did need help from Appellee to "pay his bills, write checks, buy food, and provide transportation," Decedent remained "a strong-willed man who retained sufficient ability to live his day-to-day life." Based on Decedent's strong will, the trial court found that Decedent was capable of making his own decisions regarding his property.

The evidence does not preponderate against the trial court's finding as to Decedent's mental faculties. As previously discussed, the expert testimony generally fails to establish that Decedent was suffering a significant mental decline at the time of the execution of the deed. Although there is some evidence that Decedent was indeed suffering from a mental impairment around this time, the evidence does not preponderate against the trial court's finding that, despite the decline in Decedent's mental abilities, he maintained sufficient competence to make his own decisions at the time deed was executed.

Considering the totality of the circumstances, we must conclude that the trial court did not err in finding that Appellee met his burden to show clear and convincing evidence to rebut the presumption of undue influence. There can be no dispute that this case does

relied on Appellee for advice on these matters.

involve several suspicious circumstances. The existence of some suspicious circumstances, however, may not be sufficient to show undue influence where the dominant party has presented clear and convincing evidence that the decision was the product of the decedent's free and independent will. *See In re Estate of Davis*, 2016 WL 944143, at \*23 (affirming the trial court's finding that the presumption of undue influence was rebutted by evidence that "it was Deceased who decided on the provisions of the Will" despite the existence of several suspicious circumstances). In this case, the trial court specifically found that "no one, and particularly not [Appellee], substituted their will or goals for the long-term goals of [Decedent]."

We agree with the trial court's finding that Decedent was generally a strong-willed man who was not easily led by others. As Mr. Thompson explained and the trial court credited, "You didn't make [Decedent] do nothing he didn't want to do." This Court has previously considered such a fact in refusing to invalidate a will. *See Parish*, 308 S.W.3d at 891. Indeed, many of the same facts that led to the characterization of the decedent as "headstrong" in *Parish* lead to a similar characterization in this case, including the fact that both decedents were temperamental, liked to get their way, and that it was hard to change either decedent's mind about an issue. *Id.* Likewise, the facts as found by the trial court and supported by the evidence show that Decedent expressed his intent to ensure that the farm was not sold and to allow Appellee full ownership of the farm upon his death. Such result is not entirely unexpected, as the evidence shows that among Decedent's four children, Appellee was far and away more involved in the farm than any other child. Given Appellee's far greater interest in the farm when Decedent was alive and Decedent's repeated stated intentions to leave the farm to Appellee, we must conclude that Appellee has shown "the overall fairness of the transaction," even in light of the fact that Decedent received no independent advice. *See Richmond*, 555 S.W.2d at 108 ("[A] rule requiring proof of independent advice is ordinarily applied where it is a necessary requirement and where the circumstances are such that it would be difficult to show the fairness of the transaction without proof of independent advice. The rule is peculiarly applicable in gift cases, particularly where the effect of the gift is to impoverish the donor.").[10] Thus, the trial court did not err in finding that Appellee presented clear and convincing evidence that "the will is that of [Decedent, rather than] another." *Floyd*, 553 S.W.3d at 477. Consequently, the trial court's finding that the deed should not be set aside on the basis of undue influence is affirmed.

## II.

---

[10] Appellants insist that the gift did impoverish Decedent. Appellants, however, cite only to their complaint. The allegations in their complaint are not evidence in the absence of an answer admitting the allegation. *See Reid v. Reid*, 388 S.W.3d 292, 295 (Tenn. Ct. App. 2012) (citing *Threadgill v. Bd. of Pro'l Resp.*, 299 S.W.3d 792, 812 (Tenn. 2009)). Appellee's answer did not admit the allegation that Decedent was left impoverished by the conveyance. Moreover, there is no dispute that for the short time that Decedent was able to live in the property prior to his hospitalization, the parties acted largely as if nothing had changed.

Appellants next assert that the trial court erred in denying their post-trial motion on the basis of newly discovered evidence. To recap, following trial, Appellants filed a motion ostensibly under Rule 59.07 of the Tennessee Rules of Civil Procedure, stating that they had discovered additional evidence regarding Decedent's May 27, 2015 visit to an attorney's office to draft a will. Unlike what had previously been disclosed, Appellants alleged, Decedent spoke with a lawyer and indicated his intention that the farm property be divided equally among his four children. Appellants asserted that this evidence could not have been discovered prior to trial and that it was highly relevant to the determination of whether the presumption of undue influence had been rebutted by clear and convincing evidence. The trial court, however, denied the motion on the basis that the evidence "was not newly discovered evidence but the proposed testimony reasonably could have been procured prior to trial[.]"

As an initial matter, we note that although Appellants filed their motion pursuant to Rule 59.07 of the Tennessee Rules of Civil Procedure, a Rule 59.07 motion expressly applies to actions "in which there has been a trial by jury[.]" *See also **Pickard v. Ferrell***, 45 Tenn. App. 460, 471, 325 S.W.2d 288, 292–93 (Tenn. 1959) (noting that motions should be judged by their content, rather than their caption). Appellant's motion may therefore more properly be couched as a Rule 59.04 motion to alter or amend a judgment following a bench trial. Rule 59.04's "purpose is to provide the trial court with an opportunity to correct errors before the judgment becomes final." ***Legens v. Lecornu***, No. W2013-01800-COA-R3-CV, 2014 WL 2922358, at *14 (Tenn. Ct. App. June 26, 2014). "A Rule 59 motion should only be granted 'when controlling law changes before the judgment becomes final; when previously unavailable evidence becomes available; or to correct a clear error of law or to prevent injustice' and 'should not be used to raise or present new, previously untried or unasserted theories or legal arguments.'" ***In re Lawton***, 384 S.W.3d 754, 764 (Tenn. Ct. App.2012) (quoting ***In re M.L.D.***, 182 S.W.3d 890, 895 (Tenn. Ct. App. 2005)). Appellant's motion on the basis of newly discovered evidence would therefore fall within the ambit of Rule 59.04. In any event, the ruling on either motion is reviewed for an abuse of discretion. *See **In re M.L.D.***, 182 S.W.3d at 895 (citing ***Stovall v. Clarke***, 113 S.W.3d 715, 721 (Tenn. 2003) ("We review a trial court's determination of whether to grant a Rule 59.04 motion to alter or amend a judgment under an abuse of discretion standard.")); ***Loeffler v. Kjellgren***, 884 S.W.2d 463, 468 (Tenn. Ct. App. 1994) (citing ***Mize v. Skeen***, 63 Tenn. App. 37, 42–43, 468 S.W.2d 733, 736 (Tenn. 1971) ("A trial court is given wide latitude in granting a motion for new trial, and a reviewing court will not overturn such a decision unless there has been an abuse of discretion.")).

Appellee asserts that the trial court correctly held that the evidence was not newly discovered under the rule adopted by this Court in ***Seay v. City of Knoxville***, 654 S.W.2d 397 (Tenn. Ct. App. 1983), that "to justify a new trial for newly discovered evidence it must be shown that the new evidence was not known to the moving party prior to or during trial and that it could not have been known to him through exercise of reasonable

diligence." ***Id.*** at 399. We note, however, that there have been some changes in the law that call into question whether this standard continues to apply in every situation. For example, in ***Harris v. Chern***, 33 S.W.3d 741 (Tenn. 2000), the Tennessee Supreme Court rejected the "newly discovered evidence standard" in the context of a motion to review a non-final grant of partial summary judgment under Rule 54.02 of the Tennessee Rules of Civil Procedure. ***Id.*** at 745. Instead, our supreme court directed Tennessee courts to consider the following "balancing analysis":

> 1) the movant's efforts to obtain evidence to respond to the motion for summary judgment; 2) the importance of the newly submitted evidence to the movant's case; 3) the explanation offered by the movant for its failure to offer the newly submitted evidence in its initial response to the motion for summary judgment; 4) the likelihood that the nonmoving party will suffer unfair prejudice; and 5) any other relevant factor.

***Id.*** Later, our supreme court directed courts to apply this standard to motions to alter or amend final summary judgment orders under Rule 59.04 of the Tennessee Rules of Civil Procedure. ***Stovall v. Clarke***, 113 S.W.3d 715, 721 (Tenn. 2003). Although ***Stovall*** clearly involved a motion to amend the trial court's decision on a motion for summary judgment, the express holding of the opinion was not limited to only motions to alter or amend following summary judgment. Instead, the court simply noted at follows

> A party may file a motion to alter or amend a judgment within thirty (30) days after its entry. . . . When additional evidence is presented in support of such a motion, the trial court should consider the factors applicable to a motion to revise a partial summary judgment pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure[.]

***Id.*** (citation omitted) (citing Tenn. R. Civ. P. 59.04). The court did, however, go on to cite the ***Harris*** balancing factors that specifically state that the moving parties' efforts to obtain the information "in responding to the summary judgment" should be considered. ***Id.*** (citing ***Harris***, 33 S.W.3d at 744).

Application of this less stringent standard to Rule 59.04 motions following bench trials has been somewhat unclear. Some decisions have cited both the ***Seay*** standard and the ***Harris*** balancing test to motions following bench trials *See e.g.*, ***In re Estate of Ross***, No. M2014-02252-COA-R3-CV, 2015 WL 4557058, at *6 (Tenn. Ct. App. July 28, 2015) (citing both the ***Seay*** rule and the ***Chern*** balancing factors); ***Kirk v. Kirk***, 447 S.W.3d 861, 869 (Tenn. Ct. App. 2013) (same). Other decisions continue to apply the ***Seay*** standard without consideration of the ***Harris*** balancing test. *See, e.g.*, ***Wilson Sporting Goods Co. v. U.S. Golf & Tennis Centers, Inc.***, No. E2010-02651-COA-R3-CV, 2012 WL 601804, at *5 (Tenn. Ct. App. Feb. 24, 2012); ***Pittman v. Williamson Cty.***, No. M2003-02860-COA-R3-CV, 2005 WL 1886891, at *6 (Tenn. Ct. App. Aug. 9, 2005); *cf. **Martin v. Martin***, No. M2002-02350-COA-R3-CV, 2004 WL 833083, at *10

(Tenn. Ct. App. Apr. 16, 2004) (holding that "in order for a party to obtain a new trial based on newly discovered evidence, it must be shown that the evidence was discovered after the trial"). Still, other decisions cite only the ***Harris*** balancing factors. *See, e.g.,* ***Cato v. Batts***, No. M2009-02204-COA-R3-CV, 2011 WL 579153, at \*8–\*9 (Tenn. Ct. App. Feb. 17, 2011); ***Rehrer v. Rehrer***, No. E2010-01907-COA-R3-CV, 2011 WL 13165343, at \*5 (Tenn. Ct. App. Sept. 15, 2011). Finally, at least once decision has favored an application of the ***Harris*** factors that takes into account the fact that a trial occurred. *See* ***Legens v. Lecornu***, No. W2013-01800-COA-R3-CV, 2014 WL 2922358, at \*15 (Tenn. Ct. App. June 26, 2014) (applying the ***Harris*** factors to a motion to alter or amend following  bench trial, but noting that courts should be cautious in granting such motions where a trial has already occurred).

The Tennessee Supreme Court has never expressly applied the ***Harris*** balancing test to a Rule 59.04 motion following a bench trial. The ***Harris*** opinion itself provides some guidance on this issue, however. Specifically, the Tennessee Supreme Court indicated that the less stringent rule was necessary because the litigant was not seeking to alter a trial court's findings following a trial on the merits, but rather was seeking only the basis entitlement of a first trial. ***Harris***, 33 S.W.3d at 744 (citing ***Schaefer***, 688 S.W.2d at 433). In the situation wherein a litigant seeks to submit new evidence following a trial on the merits, the court cautioned that "courts should be cautious in altering their judgments." ***Id.*** As such, while the language in ***Stovall*** is imprecise as to whether the balancing test should apply to all Rule 59.04 motions, ***Harris*** indicates that expanding its holding to all motions to alter or amend may be misguided.

Still, Appellants do not argue that the trial court erred in applying the incorrect standard to their post-trial motion. Indeed, Appellants concede in their appellate brief that the ***Seay*** newly discovered evidence standard is the appropriate standard by which to judge their motion and the trial court's ruling. It is well-settled that this Court is under no obligation to formulate a parties' argument. *See* ***Sneed v. Bd. of Prof'l Responsibility of Supreme Court,*** 301 S.W.3d 603, 615 (Tenn. 2010) ("[I]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her[.]"). In light of Appellant's failure to argue this issue and the Tennessee Supreme Court's declination to offer any specific guidance on the application of the ***Harris*** balancing factors to this situation, we will apply the ***Seay*** newly discovered evidence standard, as essentially agreed to by the parties, to this appeal.

Applying the newly discovered evidence standard, we cannot conclude that the trial court abused its discretion in denying Appellants' motion. As we have explained,

> To be successful in a motion on the basis of newly discovered evidence, the movant must prove that the evidence was discovered after the trial, that it could not have been discovered earlier with due diligence, that it is material and not just cumulative or impeaching, and that it will probably change the outcome if a new trial is granted.

*In re B.R.*, 2013 WL 6844093, at \*4–5 (citing *Isbell v. Travis Elec. Co.*, No. M1999-00052-COA-R3-CV, 2000 WL 1817252, at \*12 (Tenn. Ct. App. Dec. 13, 2000)).

Here, there is no dispute that Appellants were aware of the May 2015 attorney meeting prior to trial; indeed, Appellants knew about the meeting as early as September 2017. Ms. Bolt's affidavit in support of the motion states that, at the direction of her counsel, she contacted the law office to determine whether a will was drafted. Ms. Bolt's decision to question only "whether they had prepared a will for [Decedent]" and to speak only to a receptionist was not sufficient to disclose that a meeting had occurred in which Decedent allegedly expressed his intentions notwithstanding the lack of a will being prepared. If other information was needed concerning the statements made by Decedent concerning his intentions, Ms. Bolt or her counsel were free to ask those questions. Unfortunately, Appellants chose to stop their investigation at this point.

As such, the only difference between Appellant's ability to obtain this evidence prior to trial and after trial was that Appellants made a more diligent effort in doing so. Respectfully, this is somewhat akin to the situation wherein "the evidence always was there but no one looked for it until counsel later was obtained." *In re B.R.*, No. E2013-00714-COA-R3-JV, 2013 WL 6844093, at \*4 (Tenn. Ct. App. Dec. 26, 2013). Here, the evidence was always there, but counsel made the strategic decision to have Ms. Bolt attempt to obtain it; the only barrier to obtaining this evidence was therefore Appellant's own strategic decisions.

We agree that Appellee's deposition testimony regarding what transpired at the meeting is concerning.[11] However, we are limited by the abuse of discretion standard of review. This standard reflects "that the decision being reviewed involved a choice among several acceptable alternatives." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citing *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999)). We are therefore not permitted "to second-guess the [trial] court . . . or to substitute [our] discretion for the [trial] court's[.]" *Id.* (internal citations omitted).

In the present case, the trial court did not engage in a clearly erroneous assessment of the evidence in finding that the evidence presented in Appellant's post-trial motion could have been procured prior to trial through the exercise of due diligence. *See id.* (stating that a trial court abuses its discretion by, *inter alia*, "basing its decision on a clearly erroneous assessment of the evidence"). Indeed, Appellee's deposition testimony in which he stated that the attorney asked no questions of Decedent had little relevance to Appellant's investigation of this issue, as the deposition occurred in March 2018, months after Appellants learned of the meeting. Neither did the trial court apply an incorrect legal standard or reach an illogical conclusion. *Id.* ("A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal

---

[11] In particular, Appellee testified that the attorney did not speak to Decedent or ask Decedent "what do you want to do." Attorney Frère's deposition sharply disputes this characterization of the meeting, which he describes as going into more detail concerning Decedent's intentions.

- 16 -

standard, (2) reaching an illogical or unreasonable decision, . . . .”). As such, we cannot substitute our judgment for that of the trial court. The trial court therefore did not abuse its discretion in denying Appellant's post-trial motion to present "newly discovered" evidence.

## CONCLUSION

The judgment of the Loudon County Chancery Court is affirmed and this cause is remanded for all further proceedings. Costs of this appeal are taxed to the Appellants, Stephen Simpson and Alisa Bolt, for which execution may issue if necessary.

_____

J. STEVEN STAFFORD, JUDGE